STATE of North Dakota, Plaintiff
and Appellee,

v.

Ronald D. BRAKKE, Defendant
and Appellant,

and

Joane Kuball, Defendant.

STATE of North Dakota, Plaintiff
and Appellee,

v.

Ronald BRAKKE, Defendant,

and

Joane Kuball, Defendant and Appellant.

Cr. Nos. 900344, 900360

Supreme Court of North Dakota.

Aug. 26, 1991.

David D. Hagler (argued), Asst. State's
Atty., Fargo, for plaintiff and appellee.

Ronald D. Brakke, pro se.

Joane Kuball, pro se.

LEVINE, Justice.

Ronald D. Brakke and Joane Kuball ap-
peal from judgments of conviction entered
on separate jury verdicts finding them
guilty of theft of property and attempted
theft of property. We reverse.[1]

In the early 1980s, Alice Brakke and
Chester Brakke, Ronald Brakke's parents,
held as tenants in common an undivided
interest in real property located in Cass
County. During that time, Ronald ob-
tained several agricultural loans from Da-
kota Bank and Trust Co. of Fargo [Bank].
Chester personally guarantied some of the
loans. Ronald defaulted and the Bank then
sued Ronald and commenced a separate
suit against Chester to recover on the guar-
anty. The Bank obtained a judgment
against Ronald for more than $600,000.
On February 21, 1985, the Bank also ob-
tained a judgment against Chester for
$318,750.53.

Unable to satisfy the judgment against
Ronald from his assets, the Bank pursued
collection efforts through an execution and
levy on Chester's undivided one-half inter-
est in his and Alice's property. The Bank
purchased Chester's interest at a sheriff's
sale on February 11, 1986, and received a
sheriff's deed after the redemption period
expired one year later. At this point, the
Bank and Alice each held an undivided one-
half interest in the Cass County property.

---

1. Because these cases are factually and legally
interrelated, we resolve them in one opinion.

*See Matter of Estate of Hansen,* 458 N.W.2d 264
(N.D.1990).

In the meantime, a number of documents, purporting to convey title to the property to various trusts and other entities, was filed with the Cass County Register of Deeds. After the Bank obtained its judgment against Chester, a "tender of amends" was recorded, purportedly transferring Chester's undivided one-half interest in the property to Alice. On July 25, 1986, a "Grant Deed" was recorded, conveying Alice's interest in the property to "Pioneer Life Trust." A "Deed of Trust and Assignment of Rents" was recorded on August 17, 1988, conveying Pioneer Life Trust's interest in the property to "Common Title Bond & Trust." Also recorded on August 17, 1988, was an "Assignment" transferring the interest of Pioneer Life Trust and Common Title Bond & Trust in the property to "E.L. Price Bank."

In March 1987, the Bank commenced an action for partition and quiet title and filed a notice of lis pendens. On June 16, 1988, judgment was entered quieting title to Chester's undivided one-half interest in the Bank and appointing a referee to file a report and make recommendations concerning the partition of the property. *See* NDCC Chapter 32–16. We affirmed this judgment in *Dakota Bank & Trust v. Federal Land Bank*, 437 N.W.2d 841 (N.D.1989).

During the spring of 1989, Ronald, as he had for the past several years, planted a wheat crop on the Cass County property. On March 29, 1989, E.L. Price Bank filed with the Cass County Register of Deeds a U.C.C. financing statement, purporting to cover the proceeds of the crop. The financing statement was also filed with the Secretary of State on March 31, 1989. E.L. Price Bank was forced into bankruptcy on July 7, 1989, but the involuntary bankruptcy petition was subsequently dismissed with prejudice on August 17, 1989.

On July 13, 1989, a judgment and decree of partition was entered in the district court. The judgment awarded the Bank part of the property on which Ronald had planted the wheat crop, as well as other property not pertinent to this appeal. Alice and "her successors and assigns" were awarded other property on which Ronald had planted the wheat crop. The Bank was awarded additional property to compensate for its share of "rentals from the use of the property" it had failed to receive after February 1987. Reimbursement for lost rentals and expenses paid in connection with the proceedings totaled almost $40,000. However, the judgment was silent regarding disposition of the crops Ronald had planted during the 1989 season. We affirmed this judgment in *Dakota Bank & Trust v. Federal Land Bank of St. Paul*, 453 N.W.2d 610 (N.D.), *cert. denied*, —— U.S. ——, 111 S.Ct. 188, 112 L.Ed.2d 151 (1990).

After entry of the district court judgment partitioning the property, the Bank hired Kirk Cossette to harvest the crop on the land it had been awarded. Cossette also entered into a contract to purchase that portion of the property from the Bank.

On July 28, 1989, Cossette attempted to harvest the crop on the Bank's property but was prevented from gaining access to the grain field when Ronald, who was driving a combine, and Joane Kuball, who was driving a Jeep, blocked the road. Cossette contacted the Cass County Sheriff's Office, which sent officers to accompany Cossette back to the field. Ronald and Joane were gone when Cossette and the officers returned. Cossette began harvesting the field but quickly determined that the crop "was not ready yet" and decided to wait before harvesting the remainder.

On August 1, 1989, Cossette was told by one of his employees that there were combines harvesting the grain on the Bank's property. Cossette went to the field and observed Ronald and Joane running combines in the field. Cossette also observed Ronald dump the grain into trucks located both on and off the Bank's property. Cossette also observed Joane unload harvested grain into a truck located on the Bank's property and take harvested grain by truck to the Brakke farmstead which was located on Alice's property.

Law enforcement officers arrested Ronald and Joane at the field. They were charged with theft of property under

NDCC §§ 12.1–03–01 and 12.1–23–02 and attempted theft of property under NDCC §§ 12.1–03–01, 12.1–06–01, and 12.1–23–02. The defendants were tried together and the jury found them both guilty of all charges. These appeals followed.

We need address only one issue which the defendants have raised in their appeals: whether the trial court "erred in allowing a criminal proceeding to continue when the matter should have been adjudicated civilly?"

In *State v. Meyer*, 361 N.W.2d 221 (N.D.1985), this court reversed a defendant's conviction for obstructing a public road in violation of NDCC 24–12–02. After noting that the primary issue in the case was whether the road constituted a "public road" under the conditions specified in NDCC 24–07–01, a plurality of this court ruled:

"[W]here, as here, there is a legitimate dispute as to whether or not the necessary requirements have been met to make the road in question a road by prescription as specified in Section 24–07–01, N.D.C.C., a criminal action is ill-suited to a settlement of that dispute. Rather, we believe the proper procedure is to institute a civil action wherein the issue of whether or not the road in question has become a public road by prescription may be determined in the atmosphere of civil, rather than criminal, litigation. That procedure appears to be the procedure commonly used in North Dakota in the past to settle these disputes...." *Meyer, supra,* 361 N.W.2d at 222–223 [footnotes and citations omitted.]

This same principle requires reversal of the defendants' convictions in these cases.

The jury was instructed that the State had the burden of proving beyond a reasonable doubt that the "hard red spring wheat ... was the property of Dakota Bank and Trust Company." Thus, one of the primary issues in this case was whether the Bank was entitled to the growing crops which Ronald planted when the Bank and Alice each owned an undivided one-half interest in the property and prior to entry of the district court judgment partitioning the property. This court has never addressed whether a cotenant who plants crops on land which is subsequently lost through partition also loses entitlement to the growing crops, and authority from other jurisdictions on the question is sparse.

The State relies on several decisions of this court which stand for the general proposition that a voluntary or involuntary transfer of ownership of property passes with it the ownership of growing crops. *See Schlichenmayer v. Luithle,* 221 N.W.2d 77, 83 (N.D.1974) ["When the land was transferred by operation of law to the wife upon the death of the husband-joint tenant, the crops planted prior to his death also became her property."]; *Zeigler v. Blecha,* 59 N.D. 258, 229 N.W. 365, 366 (1930) ["The ownership of realty carries with it as an incident thereto the presumption of the ownership, not only of the natural products of the land, but also of the annually sown crops."]; *Tanous v. Tracy,* 55 N.D. 100, 212 N.W. 521 Syllabus 2 (1927) ["Growing crops are a part of the realty, and, as between mortgagor and mortgagee, the title to growing crops vests in the mortgagee at the expiration of the period of redemption from foreclosure sale."]; *see also Klevmoen v. Farm Credit Administration,* 138 F.2d 609, 610 (8th Cir.1943) ["[U]nder the law of North Dakota, those annual crops which are within the definition of fructus industriales are, during the period of their immaturity, and while they continue to derive sustenance from the soil, a part of the soil; that as such, their title is ordinarily in the owner of the land by virtue of such ownership, and passes upon his deed of the land to a purchaser or, upon involuntary alienation, to the grantee of the land at judicial sale."].[2]

The State also relies on 21A Am.Jur.2d *Crops* § 8, at pp. 607–608 (1981), which states that "[w]here the common estate is

---

2. Some jurisdictions draw a distinction between mature but unharvested crops in determining whether they pass with a voluntary or involuntary conveyance of the land. *See* Annot., *Conveyance of land as including mature but unharvested crops,* 51 A.L.R.4th 1263 (1987).

partitioned while a crop planted by one cotenant is growing thereon, the crop on the parcel set off to each tenant becomes his in severalty ... [footnote omitted]." *See also* 4 G. Thompson, *Commentaries on the Modern Law of Real Property* § 1829, a p. 331 (1979) ["If at the time of partition there is a growing crop of grain upon the land, the right to the crop follows the soil, although the crop has been sown and cultivated by one tenant who was in exclusive occupation of the land."]. The cases cited in American Jurisprudence for this proposition are *Bird v. Bird,* 15 Fla. 424 (1875), and *Calhoun v. Curtis,* 45 Mass. 413 (1842). The statement in *Bird, supra,* 15 Fla. at 443, is dictum. The court in *Calhoun, supra,* 45 Mass. at 415, after stating the general proposition, noted that the defendant had brought "himself within no exception" to the rule and implied that, under some circumstances, a cotenant may have an "equitable claim for service in cultivating the land for others' benefit...." 4 G. Thompson, *supra,* cites *Calhoun* and *Vaughn v. Newman,* 221 Ill. 576, 77 N.E. 1106 (1906). In *Vaughn, supra,* 77 N.E. at 1108, the cotenant planted the crop after a decree was entered ordering the sale of that specific property. The State does not cite, nor have we found, other case law addressing the precise issue. Needless to say, we have found no cases in which the issue has surfaced in the context of a criminal proceeding.

■ The State's direct judicial authority for the proposition that the defendants took the "property of another" [NDCC 12.1–23–02], thus rests on a 149 year-old Massachusetts decision which recognized that the defendant in that case did not bring himself within an "exception" to the rule. We agree with the general rule that, absent an express direction in the partition judgment, ownership of crops planted by a cotenant in possession of property which is subsequently partitioned to another cotenant ordinarily passes with the land to the other cotenant. Unlike the State, however, we also recognize, as did the court in *Calhoun,* that there are equitable exceptions to this rule.

For example, in *Zeigler, supra,* mortgagors of farm property planted a crop of wheat on the land after the assignee of the mortgagee purchased the property at a foreclosure sale. The mortgagors harvested the wheat crop after the period of redemption had expired and after the mortgagee's assignee had received the sheriff's deed to the property. Holding that the mortgagee's assignee did not establish ownership of or entitlement to the harvested crop, this court reasoned:

"[W]here the owner of land sells it with a right of immediate possession in the purchaser and without any reservation of the emblements, or annually sown crops, the purchaser is entitled to hold and claim the crops as his own property as against his vendor. The same result follows where a person obtains title through a sheriff's deed issued upon execution or foreclosure sale. Such deed passes to the purchaser the legal title to the land; and the annual crops then growing thereon pass with the land to the grantee in such deed. *Hendricks v. Stewart,* 53 N.D. 513, 206 N.W. 790 [1925]; *Tanous v. Tracy,* 55 N.D. 100, 212 N.W. 521 [1927]. But it is an equally well settled rule, of practically universal recognition, that 'one who sows, cultivates, and harvests a crop upon the land of another is entitled to the crop as against the owner of the land, whether he came to the possession of the land lawfully or not, provided he remains in possession of the land till the crop is harvested'. 17 C.J. p. 381; *Roney v. H. S. Halvorsen Co.,* 29 N.D. 13, 20, 149 N.W. 688 [1914]; *Golden Valley Land, etc., Co. v. Johnstone,* 21 N.D. 97, 128 N.W. 690, 694 [1910]. And *where the grantee in a sheriff's deed permits a person then in occupancy of the land to continue in uninterrupted possession thereof, and, while in such possession, to sever and thresh crops which he had previously planted, then such crops become the property of the occupant, and the owner of the land under the sheriff's deed is not the owner of such crops." Zeigler, supra,* 229 N.W. at 366 [emphasis added.]

■ *Zeigler* supports the proposition that more than the existence or knowledge of judicial proceedings affecting title to property is required to divest a cotenant who has remained in uninterrupted possession of partitioned property of the right to growing crops previously planted by that cotenant. Here, the partition judgment was silent regarding entitlement to the growing crops. Although the State asserts that Cossette's July 28, 1989, confrontation with the defendants interrupted possession in this case, it is not clear from the record whether Cossette ever told the defendants that he had been hired by the Bank to harvest the crop or that he had purchased the property. For that same reason, assuming that the defendants could be viewed as "tenants," it is debatable whether they could be considered wrongdoers "holding over." NDCC 47–16–27. On this record there is a "legitimate dispute" as to the ownership of the crops. *Meyer, supra,* 361 N.W.2d at 222.

We recognize that the defendants' respective claims of right to harvest the crop differ somewhat and that Joane did not participate in planting the crop. Ronald testified that "Western Life Trust," which is the "estate of my [late] wife and I," was asked by "Pioneer Life Trust," which is "the estate of my mother," Alice, to seed the crop. Ronald further testified that E.L. Price Bank "hired" Western Life Trust "to take the crop off." Joane, who occasionally types and notarizes legal documents for the Brakkes, testified that "E.L. Price," of the E.L. Price Bank, "requested that I go and harvest the grain that year for the bank." When asked about her knowledge of the defendants' harvesting activities of August 1, 1989, Alice admitted that she "had asked them" to harvest the crop.

We cannot ignore the obvious. Ronald planted the crop, as he had in the past, under some type of consensual arrangement with his mother, Alice, who was the Bank's cotenant. When it came time to harvest the crop, Joane, a friend of the Brakke family, attempted to assist Ronald and Alice. Even if we assume that E.L. Price Bank is a legitimate entity, it was a purported successor to Alice's cotenancy interest in the property. Thus, neither defendant would be a "trespasser" with regard to the crop. *See Gunsch v. Gunsch,* 67 N.W.2d 311, 327 (N.D.1954); *Wadge v. Kittleson,* 12 N.D. 452, 97 N.W. 856, 859 (1903). Rather, their attempt to harvest the grain would have been with the permission of a cotenant who had a colorable claim to the crop.

The State offers "one simple response" to the defendants' assertion that this matter should have been resolved in a civil proceeding: "look at the abundance of civil litigation regarding the property over the last six years." When a legitimate dispute exists, however, a prior "abundance of civil litigation" does not justify resort to the criminal process in an attempt to put an end to the litigation.

We do not intend to suggest that Ronald, Joane, Alice, or E.L. Price Bank was entitled as a matter of law or equity to the crops grown on the Bank's partitioned property. We point out only that a legitimate dispute exists. The dispute over ownership of the crop raises issues which have never been decided by this court and which have only rarely been touched upon by courts in other jurisdictions. A criminal theft trial is not the proper vehicle for resolving property law questions of this nature.

We reverse the judgments of conviction and remand to the trial court for the entry of judgments of acquittal. *See Meyer, supra,* 361 N.W.2d at 223.

VANDE WALLE, Acting C.J., and VERNON R. PEDERSON, ROY A. ILVEDSON and DOUGLAS B. HEEN, Surrogate Justices, concur.

DOUGLAS B. HEEN, VERNON R. PEDERSON and ROY A. ILVEDSON, Surrogate Justices, sitting in place of ERICKSTAD, C.J., and GIERKE and MESCHKE, JJ., disqualified.