1998 ND 121

**STATE of North Dakota, Plaintiff and Appellant,**

v.

**Leonard Wayne BURCKHARD, Defendant and Appellee.**

**Criminal No. 970275.**

Supreme Court of North Dakota.

June 4, 1998.

Robin Huseby, State's Attorney, Valley City, for plaintiff and appellant.

Robert G. Hoy, West Fargo, for defendant and appellee.

SANDSTROM, Justice.

[¶ 1] The State appealed from a district court order dismissing for lack of subject matter jurisdiction a criminal complaint against Father Leonard Burckhard. We hold the court's exercise of jurisdiction over prosecution of theft charges against Burckhard does not require excessive government entanglement in religious affairs in violation of the First Amendment of the United States Constitution or Article I, Section 3, of the North Dakota Constitution. We, therefore, reverse and remand for a trial on the merits.

## I

[¶ 2] Burckhard was a parish priest for St. Catherine's Church in Valley City. The church is within the Fargo Diocese of the Roman Catholic Church. St. Catherine's Church is a "juridic person" under the canon law of the Roman Catholic Church and is also a North Dakota corporation. The State filed a criminal information against Burckhard, alleging he committed theft of property, a class B felony, in violation of N.D.C.C. §§ 12.1–23–02(1) and 12.1–23–05(1). The complaint alleges Burckhard "knowingly took and exercised unauthorized control over money in excess of $100,000.00 belonging" to the church and "did spend money on personal matters including, for example, the payment of personal credit cards, payments to various personal stock brokers, payments for unauthorized personal bills, payments for sporting equipment, payments to relatives, and payments for fishing trips, all with intent to deprive St. Catherine['s] Church of said money."

[¶ 3] Burckhard moved to dismiss the complaint under N.D.R.Crim.P. 12(b), alleging: (1) the court did not have subject matter jurisdiction, because assumption of jurisdiction would involve excessive entanglement in religious affairs in violation of the Establishment Clause and N.D. Const. Art. I, § 3; (2) Burckhard had legal authority of the funds at issue under the regulations and canons of the Roman Catholic Church; and (3) the criminal prosecution was inappropriate under *State v. Brakke,* 474 N.W.2d 878, 882 (N.D.1991).

[¶ 4] The district court dismissed the complaint for lack of subject matter jurisdiction, explaining:

"One of the principles upon which this country was founded was separation of church and state. . . .

"Because of the unique position that churches and religious organizations have in this country the courts have refused to exercise jurisdiction in matters involving theological controversy, church discipline, and ecclesiastical government. The courts have left those matters to the church to resolve.

\* \* \* \* \* \*

"In any theft case one of the issues that has to be resolved is the authority of the person charged. In order to do that the relationship between the victim of the alleged crime and the person charged has to be examined. . . . .

"In the Roman Catholic Church, the authority that a priest has and the relationship that the priest has with the church is defined by the code of cannon [sic] law. . . .

\* \* \* \* \* \*

"This type of determination, requiring interpretation of cannon [sic] law, is the kind that the North Dakota Supreme Court and the United States Supreme Court has said civil courts should abstain from. Matters of theological controversy, church discipline, and ecclesiastical government are best left to the church to resolve. . . ."

[¶ 5] The State appealed from the order dismissing the criminal complaint.

[¶ 6] The district court had apparent jurisdiction under N.D. Const. Art. VI, § 8, and N.D.C.C. § 27–05–06. The appeal is timely under N.D.R.App.P. 4(b). This Court has jurisdiction under N.D. Const. Art. VI, § 6, and N.D.C.C. §§ 29–01–12 and 29–28–07.

## II

[¶ 7] On appeal, the State asserts the district court erred in dismissing the criminal complaint, because prosecution of the charges against Burckhard does not require excessive entanglement in religious affairs in violation of the federal or state constitutions.

### A

[¶ 8] N.D.R.Crim.P. 12(b) provides: "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." We described the purpose and limitations of motions to dismiss under this rule in *State v. Howe,* 247 N.W.2d 647, 652 (N.D. 1976):

> "[T]he purpose of a motion to dismiss is to test the sufficiency of the information or indictment. It is not a device for summary trial of the evidence, and facts not appearing on the face of the information cannot be considered. The court is obliged to confine itself to the face of the information. Further, for purposes of the motion, all well-pleaded facts are taken to be true." (Citations omitted.)

The criminal complaint alleged Burckhard exercised unauthorized control of church funds. A motion to dismiss is not a proper procedural vehicle to determine the factual questions regarding Burckhard's authority to expend church funds or whether he made unauthorized expenditures with the funds.

[¶ 9] Burckhard's jurisdictional claim, however, does not seek to resolve these factual questions. Burckhard argues the federal and state constitutions deprive the court of subject matter jurisdiction to resolve these factual issues, because their resolution would involve impermissible excessive entanglement of government in religious affairs. This issue of whether the federal or state constitutions deprive the court of subject matter jurisdiction is a question of law. *Basich v. Board of Pensions (ELCA),* 540 N.W.2d 82, 85 (Minn.App.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996). We conclude it is, therefore, an appropriate issue for resolution under N.D.R.Crim.P. 12(b).

### B

[¶ 10] The First Amendment to the United States Constitution provides, in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The First Amendment was made applicable to the states through the Fourteen Amendment in *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); and *Everson v. Board of Educ.,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). The Establishment Clause was intended to erect "a wall of separation between church and State." *Reynolds v. United States,* 98 U.S. (8 Otto) 145, 164, 25 L.Ed. 244 (1878). Similarly, N.D. Const. Art. I, § 3, provides, in part: "[t]he free exercise and enjoyment of religious profession and worship, without discrimination or preference shall be forever guaranteed in this state...." This provision affords protections similar to those provided by the Establishment Clause. *Bendewald v. Ley,* 39 N.D. 272, 168 N.W. 693, 696 (1917) (the First Amendment and this provision of the North Dakota Constitution are "to the same effect").

[¶ 11] In *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (citations omitted), the United States Supreme Court outlined a three-prong test for determining whether a policy or statute violates the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ....; finally, the statute must not foster 'an excessive government entanglement with religion.'"

[¶ 12] Burckhard does not argue the criminal theft statute has no secular legislative purpose, nor does he argue the statute has a primary effect of either advancing or inhibiting religion. Rather, Burckhard claims prosecution of the charges brought against him under this statute involves questions about his authority over church monies which, in resolving, would require excessive entanglement by the courts into the affairs of the church in violation of this third prong for testing state action under the Establishment Clause. Burckhard's argument relies upon

several United States Supreme Court civil cases, dealing with separation of church and state and defining limitations imposed by the Establishment Clause.

## C

[¶ 13] The seminal case regarding separation of church and state is *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871). In *Watson* members of a local Presbyterian church in Louisville, Kentucky, became involved in a dispute over the issue of slavery and divided into two distinct bodies, each claiming the exclusive right to the church property. The Court announced a rule of deference by the civil courts when the religious congregation holding disputed property is a subordinate member of a hierarchical church organization: [1]

"In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."

*Watson,* 80 U.S. at 727. Applying these principles, the Court concluded the group which had wholly separated itself from the church organization and now denied its authority and denounced its actions had no right to the church property. The Court did not declare civil courts were without jurisdiction to resolve church property disputes. Instead, it admonished the courts, under separation of church and state principles, to decide church property disputes by paying homage to the pronouncements and decisions of the highest church authority or tribunal.

[¶ 14] These principles were adhered to and further explained in *Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1,

50 S.Ct. 5, 74 L.Ed. 131 (1929). The Archbishop refused to appoint Gonzalez chaplain of the Roman Catholic Diocese of Manila, concluding, under the code of canon law, Gonzalez did not have the requisite qualifications for a chaplain. In the Philippine courts Gonzalez sued the Archbishop, claiming he was the lawful heir to the collative chaplaincy. The Archbishop argued the Philippine courts lacked jurisdiction to decide the case.

[¶ 15] The United States Supreme Court rejected the jurisdictional argument, reaffirming *Watson*'s guiding principle of civil courts giving deference to the decisions of the church on ecclesiastical issues:

"There is jurisdiction of the subject-matter; for the petitioner's claim is, in substance, that he is entitled to the relief sought as the beneficiary of a trust.

"... Because the appointment is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them. In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise."

*Gonzalez,* 280 U.S. at 16, 50 S.Ct. at 7–8. Gonzalez's claim of the chaplaincy was denied, because the Archbishop's interpretation of the canon law was dispositive and binding upon the court.

[¶ 16] In *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 120–21, 73 S.Ct. 143, 156–57, 97 L.Ed. 120 (1952), the United States Supreme Court elevated the *Watson* rule of civil court deference to ecclesiastical decisions made by the church from one based upon general principles of separation of church and state to one based upon a First Amendment right to free exercise of religion against state interference.

[¶ 17] In *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian*

---

1. The parties agree St. Catherine's Church, as a body of the Roman Catholic Church, is part of a hierarchical religious organization.

*Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), two local Georgia churches withdrew from a hierarchical church organization, claiming the general church had abandoned its original tenets and doctrines and replaced them with policies utterly variant from the purposes for which the church was founded. The Georgia court, in attempting to resolve the resulting property dispute, applied a "departure-from-doctrine approach" and instructed the jury to determine whether the actions of the general church amounted to a substantial abandonment of the original tenets and doctrines of the church. The United States Supreme Court rejected Georgia's approach, because it required the courts to become substantially involved in ecclesiastical matters:

> "[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, ... the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine...."

*Presbyterian Church,* 393 U.S. at 449, 89 S.Ct. at 606.

[¶ 18] *Serbian Eastern Orthodox Diocese, Etc. v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), involved a protracted dispute over the control of the Serbian Eastern Orthodox Diocese for the United States and Canada. The Holy Assembly of Bishops and the Holy Synod of the Serbian Orthodox Church removed the bishop and reorganized into three dioceses. The defrocked bishop filed suit in the Illinois courts, seeking to have himself declared the bishop seeking reinstatement. The Supreme Court of Illinois affirmed the trial court's reinstatement of the bishop, holding his removal and defrockment by the church was "arbitrary" because the proceedings against him had not been conducted in accordance with the church's constitution and penal code. The Illinois court also held the Diocesan reorganization was invalid because it exceeded the scope of the mother church's authority to effectuate such changes. The United States Supreme Court reversed, concluding the Illinois court's extensive inquiry into the rulings and policy of the church violated First and Fourteenth Amendment prohibitions against excessive entanglement in religious affairs:

> "[W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them. . . .

> \*   \*   \*   \*   \*   \*

> "Yet having recognized that the Serbian Orthodox Church is hierarchical and that the decisions to suspend and defrock respondent Dionisije were made by the religious bodies in whose sole discretion the authority to make those ecclesiastical decisions was vested, the Supreme Court of Illinois nevertheless invalidated the decision to defrock Dionisije on the ground that it was 'arbitrary' because a 'detailed review of the evidence discloses that the proceedings resulting in Bishop Dionisije's removal and defrockment were not in ac-

cordance with the prescribed procedure of the constitution and the penal code of the Serbian Orthodox Church.' . . . Not only was this 'detailed review' impermissible under the First and Fourteenth Amendments, but in reaching this conclusion, the court evaluated conflicting testimony concerning internal church procedures and rejected the interpretations of relevant procedural provisions by the Mother Church's highest tribunals. . . . In short, under the guise of 'minimal' review under the umbrella of 'arbitrariness,' the Illinois Supreme Court has unconstitutionally undertaken the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals of this hierarchical church. . . ."

*Serbian,* 426 U.S. at 709, 717–18, 96 S.Ct. at 2380, 2384–85.

[¶ 19] "'[A] State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" *Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775 (1979).

### D

[¶ 20] This Court has also addressed issues involving church property disputes, and has recognized civil courts, in resolving these disputes, must give deference to church decisions on ecclesiastical issues:

> "Civil courts will assume jurisdiction where property rights are involved. Where a local religious society holding property is but a subordinate member of a larger organization with ultimate power in some supreme judicatory, the court will follow the decision of the proper ecclesiastical body if such decision becomes important in determining property rights. The ecclesiastical body in making its decisions can interpret its own laws and pass upon its own procedure without court interference."

*Presbytery of Bismarck v. Allen,* 74 N.D. 400, 22 N.W.2d 625, 631 (1946); *see also Bendewald v. Ley,* 39 N.D. 272, 168 N.W. 693, 697 (N.D.1917).

### E

[¶ 21] Recognizing civil courts are constitutionally prohibited from reviewing church decisions on internal policy and doctrine, some courts have refused to exercise civil jurisdiction when, in the court's view, a prohibited analysis and review of church policy or doctrine was inescapable. For example, in *Basich v. Board of Pensions (ELCA),* 540 N.W.2d 82, 86 (Minn.App.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996), several Lutheran pastors, an employee, and a congregation sued the Evangelical Lutheran Church of America and its Board of Pensions for breach of contract and fiduciary duty for allegedly making pension fund investments based on social concerns rather than the economic best interests of the plaintiffs. The Minnesota Court of Appeals concluded the lawsuit would require the court to become entangled in ecclesiastical issues of church policy in violation of the First Amendment and, consequently, the court was constitutionally precluded from exercising jurisdiction.

[¶ 22] Similarly, in *McDonnell v. Episcopal Diocese of Georgia,* 191 Ga.App. 174, 381 S.E.2d 126, 127, *cert. denied,* 493 U.S. 935, 110 S.Ct. 328, 107 L.Ed.2d 318 (1989), the Georgia Court of Appeals concluded the First Amendment prevented Georgia courts from exercising jurisdiction in a lawsuit filed by a minister of the Episcopal Diocese of Georgia, alleging breach of contract by the Diocese in terminating his employment. The court concluded a review of the pastor's termination by the church required prohibited "entanglement of civil authority into ecclesiastical affairs." *See also Drevlow v. Lutheran Church, Missouri Synod,* 991 F.2d 468, 471 (8th Cir.1993) (First Amendment barred adjudication of portion of minister's complaint alleging the church violated its own bylaws by removing the minister's name from a list of ministers eligible for employment).

### III

[¶ 23] Burckhard's counsel asserts, "to determine the scope of authority Father Burckhard had over the funds of St. Catherine's parish . . . would directly interject the Court into a resolution of the polity of the Holy

Roman Catholic Church" in violation of the Establishment Clause.

[¶ 24] None of the cases relied upon by Burckhard involve criminal prosecutions. Nor do the cases he cites, in our view, support his argument the trial court was constitutionally deprived of subject matter jurisdiction to entertain these criminal proceedings. Rather, those authorities require civil courts to accept the church's rulings on ecclesiastical issues and apply those rulings to the facts of the case in resolving the litigation.

[¶ 25] The Establishment Clause forbids courts from second-guessing the church's rulings on internal matters of policy and doctrine, because the process of second-guessing would require excessive government entanglement in church affairs. That type of review would violate the basic principles of separation of church and state upon which this nation was founded. Civil courts, however, do not lose jurisdiction merely because litigation involves some dispute over church property. There is no constitutional proscription against courts assuming jurisdiction to resolve litigation involving church personnel or property if the case can be resolved without court interference in church policy and doctrine.

[¶ 26] The dispositive issue is whether the district court in this case is constitutionally proscribed from exercising jurisdiction, lest it become excessively entangled in questions of the Catholic church's religious policy and doctrine. We are not convinced the court's jurisdiction is so circumscribed. In reaching this conclusion, we are guided by several criminal cases, allowing courts to exercise jurisdiction over prosecutions against the clergy of religious organizations.

A

[¶ 27] In *United States v. Rasheed*, 663 F.2d 843 (9th Cir.1981), *cert. denied*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982), the founder of a church and his associate minister were convicted of fraudulently and deceitfully conducting a church donation program. On appeal, the defendants claimed the First Amendment barred their convictions because their program constituted a "religious tenet" and the First Amendment

prevented the government from proving the falsity of the program. While recognizing the church was a bona fide religious organization, the Ninth Circuit Court of Appeals rejected the defendant minister's First Amendment arguments, concluding "the First Amendment does not protect fraudulent activity performed in the name of religion." *Rasheed* at 847

[¶ 28] A minister of a local Baptist church was convicted of mail fraud and tax evasion in *United States v. Snowden*, 770 F.2d 393 (4th Cir.), *cert. denied*, 474 U.S. 1011, 106 S.Ct. 540, 88 L.Ed.2d 470 (1985). The Baptist church retained a company to supervise the construction of a church building. The owners of the supervising company paid Pastor Snowden about $80,000 in kickbacks, which he deposited into his personal checking account. On appeal from his conviction, the pastor asserted the charges should have been dismissed on First Amendment grounds, because they posed an impermissible risk of entangling the government in internal church affairs. The Fourth Circuit Court of Appeals rejected the pastor's First Amendment argument, stating: "the defendants seek to use the clause as a sword against the victim, the church ... [t]he First Amendment rights of these defendants are not involved in this case...." *Snowden* at 396.

[¶ 29] *United States v. Lilly*, 37 F.3d 1222 (7th Cir.1994), *cert. denied*, 513 U.S. 1175, 115 S.Ct. 1155, 130 L.Ed.2d 1112 (1995), involved the prosecution of the pastor of a local Baptist church for securities fraud and income tax evasion. In *Lilly*, the church sold certificates of deposit to members through its pastor, who made false and fraudulent representations in making the sales. He then converted about $900,000 of the funds for his personal benefit. On appeal from his conviction, the pastor's First Amendment challenge was rejected by the Seventh Circuit Court of Appeals:

"Pastor Lilly's First Amendment challenge does not constitute plain error because it constitutes no error at all. For clarity, we stress that Pastor Lilly does not maintain that the tenets of his religion require him to undertake securities fraud.... Instead, he asserts that '[t]he ability to de-

termine what is an appropriate use of church money is at the heart of the charges brought against' him and that '[a]llowing the Court, or a branch of the United States Government, to make that determination violated Pastor Lilly's constitutionally protected free exercise of religion.'

"In support of his argument, Pastor Lilly refers us to *Maryland & Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) and *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), for the proposition that the First Amendment guarantees him the right to determine the appropriate use of church money without government interference. . . .

"Without a doubt, neither of the cases the Pastor cites has any application to this case. First and most obviously, this is a criminal case, not a civil one. *Maryland & Virginia Eldership* and *Milivojevich* by their terms apply only to adjudications of civil disputes.

"Moreover, even in this criminal context, neither the district court nor we are asked to resolve any property dispute or overturn any church decision. The district court's determination of the Pastor's guilt had absolutely nothing to do with reviewing the church's internal allocation of funds, nor did it implicate any issue of religious polity. . . .

". . . [N]either the U.S. Attorney's investigation into the Pastor's conduct, nor the district court's adjudication of his guilt, required any governmental foray into the realm of religious law or any repudiation of an ecclesiastical tribunal's decision. Pastor Lilly's First Amendment challenge to his conviction is without merit.

\* \* \* \* \* \*

"Because Pastor Lilly was the Church's financial decisionmaker, church-member investors and church personnel trusted him to be the sole, unsupervised manager of the Church's finances. This position of trust allowed the Pastor to control the Church's bank accounts and misapply the certificate funds clandestinely. . . . The district court therefore correctly determined that Pastor Lilly occupied and abused a position of trust."

*Lilly* at 1226–27.

[¶ 30] We are persuaded, by these authorities, the district court has jurisdiction and is not precluded from assuming it by either federal or state constitutional proscriptions against excessive government entanglement in religion. *See also Scott v. Rosenberg*, 702 F.2d 1263, 1276 (9th Cir.1983), *cert. denied*, 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984) (FCC investigation of the television and radio stations of the defendant's church did not violate the defendant's First Amendment rights and defendant failed to demonstrate threat of pervasive governmental regulation in violation of the Establishment Clause); *Scott v. State*, 149 Ga.App. 59, 253 S.E.2d 401, 403, *cert. denied*, 444 U.S. 925, 100 S.Ct. 264, 62 L.Ed.2d 181 (1979) (pastor's conviction for misappropriating funds advanced to the church upheld, without discussion of jurisdictional issue).[2]

**B**

[¶ 31] The State alleges Burckhard used church funds for personal purposes, entirely unrelated to the church's business or mission. We are not convinced prosecution of these charges requires the court to interpret or review church doctrine, policy, or laws. As in any theft case involving allegations the defendant misused funds entrusted to him, the State will need to produce evidence, through testimony of church officials or other appropriate means,[3] of the authority entrusted to the defendant and conduct outside that authority. It is for the factfinder to decide whether the defendant made unauthorized expenditures of church funds. The mere fact a church official's wrongful conduct may violate church policy or canon law in no way

**2.** The dissent has not cited and we have found no case dismissing a criminal prosecution against a member of the clergy on First Amendment excessive entanglement grounds.

**3.** *See, e.g.*, N.D.R.Crim.P. 15(h) and (j) for permissible use of deposition testimony.

precludes the same conduct from also violating and being prosecuted under secular criminal laws. *See United States v. Fawbush,* 946 F.2d 584, 588 (8th Cir.1991) (pastor's conviction for aggravated sexual abuse affirmed); *People v. Hodges,* 10 Cal.App.4th Supp 20, 13 Cal.Rptr.2d 412, 421 (1992) (pastor and assistant pastor convicted of violating statute requiring them to report suspected incidents of child abuse); *McGowan v. State,* 198 Ga.App. 575, 402 S.E.2d 328, 331 (1991) (pastor's conviction for child molestation, cruelty to children, and aggravated assault with attempt to rape affirmed). For the same wrongful conduct, a church official can be sued in the courts for civil damages. *See Smith v. O'Connell,* 986 F.Supp. 73, 81–2 (D.R.I.1997) (motion to dismiss for lack of subject matter jurisdiction denied in an action brought against priest, diocesan officials, and churches for damages caused by sexual assault by priest against minors); *Doe v. Hartz,* 970 F.Supp. 1375, 1390 (N.D.Iowa 1997) (under Rule 12(b) motion court refused to dismiss for lack of subject matter jurisdiction the plaintiff's claim for damages alleging sexual exploitation in violation of the Violence Against Women's Act, 42 U.S.C. § 13981, by parish priest); *Mrozka v. Archdiocese of St. Paul & Minneapolis,* 482 N.W.2d 806, 814 (Minn.App.1992) (civil damage action against church for sexual abuse of child by pastor was proper and award of punitive damages against church was not unconstitutional).

[¶ 32] Unlike the cases relied upon by Burckhard, there is no dispute here between splintered factions of a church, each claiming the church property. This is not a case involving complicated questions of ecclesiastical policy or church doctrine. The question, simply put, is whether the church authorized Burckhard to expend church funds on himself and others in the manner the complaint alleges he spent those funds. There need be no second-guessing by the trial court or jury of the church's answer. It can and must be taken at face value. We hold neither the Establishment Clause of the First Amendment nor N.D. Const. Art I, § 3, preclude the district court from exercising jurisdiction over this criminal prosecution.

## IV

[¶ 33] In addition to Burckhard's First Amendment claim, he also asserted the complaint should be dismissed because he has "legal" authority over the church funds he allegedly expended without authority. In support of his argument, Burckhard submitted to the district court various canons of law of the Roman Catholic Church and a letter from the bishop of the Fargo Diocese explaining, in general terms, the authority of a parish priest to administer church property.

[¶ 34] Burckhard's counsel argues, "Bishop Sullivan has determined ... that Father Burckhard had the authority to exercise control over the parish assets...." He further argues, "Father Burckhard cannot be convicted of theft of parish property in a secular court because the parish priest has the right to exercise control over parish funds and, in this case, the highest ecclesiastical authority to whom this issue has been taken has so ruled."

[¶ 35] Burckhard's counsel paints with too broad a brush Bishop Sullivan's picture of Burckhard's authority over the church funds. In his letter, Bishop Sullivan states, in part,

> "In accordance with the code of Canon Law, Father Burckhard was responsible for administration of all ecclesiastical goods belonging to St. Catherine's parish.... As you are aware, troubling reports from St. Catherine's concerning the actions of Father Burckhard caused my office to investigate these allegations and initiate ecclesiastical procedures to redress any improprieties. Father Burckhard was removed from the parish on October 20, 1996."

Although the precise question of whether Burckhard had authority to spend parish funds as the complaint alleges he spent them was never asked of Bishop Sullivan, the Bishop's letter certainly does not support Burckhard's claim he had absolute or unlimited authority to expend church funds.

[¶ 36] The issue of Burckhard's authority over the church funds is a question of fact not appropriate for resolution under a N.D.R.Crim.P. 12(b) motion to dismiss. *State v. Howe,* 247 N.W.2d 647, 652 (N.D.

1976). A 12(b) motion to dismiss is not a device for summary trial of the evidence, and all pleaded facts are taken to be true. *Id.* The facts, as pleaded, state Burckhard made unauthorized expenditures using church monies for his own personal purposes. The State has the burden of proving the unauthorized use of the funds, but that is a matter for trial on the merits, not for dismissal under N.D.R.Crim.P. 12(b).

## V

[¶ 37] In requesting dismissal of the charges, Burckhard also argued prosecution of the case was inappropriate under *State v. Brakke*, 474 N.W.2d 878 (N.D.1991). The defendants in *Brakke* were charged with theft of property for harvesting grain belonging to another party. The defendants had planted the crops as co-tenants on land which was subsequently lost through partition, but the partition judgment was silent regarding ownership of the crops. The legal question regarding ownership of the crops growing on the partitioned land had not been previously resolved in this jurisdiction, and the question was largely unresolved in other jurisdictions. Under those circumstances, this Court concluded the issue of crop ownership was a civil matter and not appropriate for criminal adjudication.

[¶ 38] *Brakke* is not applicable to this case. Ownership of the property allegedly taken by theft in *Brakke, i.e.,* the growing crops, was clearly in dispute and not easily determined by existing caselaw. Ownership of the property here is not in dispute; it is property of the church. There is no need to resolve any complex legal ownership issue as a prerequisite to litigating the criminal charges against Burckhard. We hold *Brakke* does not apply and provides no basis for dismissing the criminal complaint.

## VI

[¶ 39] We hold the district court is not prohibited by the federal or state constitutions from exercising jurisdiction in this criminal prosecution of theft charges against Burckhard. We further hold the alternative grounds raised by Burckhard for dismissal of the complaint under N.D.R.Crim.P. 12(b) are without merit. Consequently, the district court erred in dismissing the criminal complaint. We reverse and remand for a trial on the merits.

[¶ 40] NEUMANN, J., concurs.

VANDE WALLE, Chief Justice, concurring specially.

[¶ 41] Insofar as the opinion written by Justice Sandstrom and the opinion written by Justice Meschke view Bishop Sullivan's letter differently, I believe this matter should be remanded to clarify the Bishop's position as to the question of the authority of Father Burckhard to spend the money. To this limited extent, I agree with the remand ordered in Justice Sandstrom's opinion. If the Bishop's response is as Justice Meschke construes the current response, I would concur in Justice Meschke's opinion.

[¶ 42] Gerald W. Vande Walle, C.J.

MESCHKE, Justice, dissenting.

[¶ 43] I respectfully dissent.

[¶ 44] The State charged Burckhard with violating N.D.C.C. § 12.1–23–02(1) for, "while being a priest of the church knowingly [taking] and exercis[ing] unauthorized control over money in excess of $100,000.00 belonging to St. Catherine Church of Valley City," alleging he spent "money on personal matters ... with intent to deprive St. Catherine Church of [the] money." To convict, the State must prove Burckhard knowingly exercised "unauthorized control over, or [made] an unauthorized transfer of an interest in, the property of another with intent to deprive the owner thereof." N.D.C.C. § 12.1–23–02(1). The majority finally agrees in paragraph 31, "the State will need to produce evidence, *through testimony of church officials* or other appropriate means, of the authority entrusted to [Burckhard] and conduct outside that authority," (my emphasis), but the majority is "not convinced" this prosecution "requires the court to interpret or review church doctrine, policy, or laws." Since no church official initiated this charge apparently, I am perplexed about how this case can proceed without the court nec-

essarily examining and interpreting church laws and policies.

[¶ 45] The majority does not look at the evidence in this record about the scope of authority of this parish priest:

> In juridical matters, the pastor acts in the name of the parish. The pastor of the parish has responsibility for the administration of all parish property. If he is negligent in his duties, however, it is the right of the Bishop to intervene. If the Bishop finds negligence, he has the right to correct errors, demand a different method of administration, or apply punitive measures. The code [of Canon law] also gives the possibility of recourse within ecclesiastical procedures if actions of its administrator have damaged a juridic person. (Canon 1284 Paragraph 3). This recourse could be either through ecclesiastical courts or through the Bishop. (Canon 128).

Letter from Bishop James S. Sullivan, Bishop of the Diocese of Fargo (July 21, 1997). In my opinion, the Bishop's explanation clearly invokes the rule of deference by the civil courts, which the majority recognizes in paragraph 25, that "forbids courts from second-guessing the church's rulings on internal matters of policy and doctrine, because the process of second-guessing would require excessive government entanglement in church affairs." While the majority gives lip service to this rule of deference, it unfortunately declines to apply it at this stage in this case.

[¶ 46] Embezzlement from a private, unregulated organization by one of its officials is necessarily a property dispute because the official's authority is fixed by the internal laws and policies of that organization. When the organization is a church, a contested criminal prosecution will often become an "extensive inquiry by civil courts into religious law and polity." *See Serbian Eastern Orthodox Diocese, Etc. v. Milivojevich,* 426 U.S. 696, 709, 96 S.Ct. 2372, 2380, 49 L.Ed.2d 151 (1976). "[T]he First Amendment commits [this kind of inquiry] exclusively to the highest ecclesiastical tribunals of this hierarchical church." *Id.* at 720, 96 S.Ct. at 2375. In *Employment Division, Dep't of Human Resources v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990) (citations omitted), the majority of the United States Supreme Court summarized the *Serbian Eastern Orthodox Diocese* precedent and related ones this way: "The government may not ... lend its power to one or the other side in controversies over religious authority or dogma."

[¶ 47] The Catholic church "has the right to adjudicate and enforce its own ecclesiastical laws." Bishop Sullivan explained that here in his July 21, 1997 letter in this record:

> As a historic principle, the Church claims the right to control its own temporal goods. (Canon 1254 Paragraph 1). Further, all temporal goods belonging to any public juridic person in the Church are ecclesiastical goods and are regulated by the Code of Canon Law. (Canon 1257 Paragraph 1).
>
> The Code of Canon Law describes a parish as a community of the Christian faithful established on a stable basis. A parish is a juridic person. As the subject of rights and obligations, the parish must be supervised by a physical person who represents it in all juridic affairs. (Canon 532). The responsibility for administration of all ecclesiastical goods lies with the physical person who governs the juridic person to whom the goods belong. (Canon 1279 Paragraph 1).
>
> . . .
>
> The ecclesiastical laws and policies of the Diocese determine how much of the contributions given to the Church are to be used for the personal support of the parish priest. Any abuses or violations of these policies are violations of ecclesiastical law. In summary, under Canon law, the parish priest is responsible for administering the temporal goods of the parish. He is responsible to decide upon the proper use of the goods of the parish. This responsibility is regulated by the laws of the Church and by his ecclesiastical superiors, primarily the Bishop. The laws of the Church provide for the right of the Bishop to intervene if there is an abuse in the administration of the temporal goods of a parish. They provide procedures for recourse by the parish if the negligence of the pastor

should damage it. And, of course, *the Church has the right to adjudicate and enforce its own ecclesiastical laws.* (My emphasis). As the Bishop explained, unhappy parishioners have recourse through internal church procedures, even if the church chooses not to criminally prosecute a wayward priest.

[¶ 48] In this appeal, the prosecution tried to minimize the potential of entanglement with internal church affairs by arguing: "[T]he outcome of the case is certainly not *completely* reliant on canon law because, in an embezzlement situation, factors other than whether the person had some authority over the funds are important." I believe that attitude is too short-sighted. A hierarchical church, like this one, sets its own standards and controls its own property. There are *no* regulatory standards for a church's use of its property and funds as there are for publicly regulated organizations, like banks or business corporations.

[¶ 49] This prosecutor appears too unconcerned about the Free Exercise of Religion aspects of this case, in my opinion. Her brief asserted: "The State will rely on statements, evidence, documents, and an examination of church accounts by [a Certified Public Accountant firm] who was hired by St. Catherines after this scheme was discovered." Without the necessary foundation about the Catholic church's hierarchical structure, canon laws, and internal authorizations, that material will be of doubtful admissibility and little evidentiary value, in my opinion, unless the Bishop or higher church officials press the criminal prosecution of this priest.

[¶ 50] In her brief, the prosecutor argued: Adoption of the "lack of jurisdiction" defense strips parishioners of the right to be part of a law abiding group the moment they become part of the congregation. As citizens of North Dakota, they are entitled to the protection of the laws of North Dakota.

This prosecutor thus seems blind to the principle of separation of church and state under the First Amendment when she resists recognition of exclusive church jurisdiction over its own funds, and when she seeks to prosecute at the insistence of a faction of local parishioners, rather than at the instigation of church officials. As the Minnesota Court of Appeals recently explained, *Basich v. Board of Pensions, Evangelical Lutheran Church in America,* 540 N.W.2d 82, 85 (Minn.App. 1995), "[i]f a [case] involves core issues of ecclesiastical concern, the potential for government entanglement in religious matters prevents judicial review," and "deprives the court of subject matter jurisdiction."

[¶ 51] In certain cases, the courts can certainly "exercise jurisdiction over prosecutions against the clergy of religious organizations," so I agree with parts IIIA and B of the majority. The majority fails to observe, however, that the examples they cite involve violations of neutral legal standards that do not depend on the internal authority of the particular church official prosecuted—mail fraud, securities fraud, tax evasion, sexual abuse, child molestation. No dispute between local parishioners and church governance affects the neutral legal standards that control those categories of criminal conduct. As the majority in *Smith,* 494 U.S. at 879, 110 S.Ct. at 1600, explained, the United States Supreme Court has "consistently held that the right of free exercise [of religion] does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)'" (citing *United States v. Lee,* 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 1058 n. 3, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in judgment)). A criminal prohibition against embezzlement in a private organization is not a "neutral" law because it wholly depends on the organization's internal authorizations.

[¶ 52] Because "civil courts ... must give deference to church decisions on ecclesiastical issues," (majority opinion, paragraph 20), North Dakota courts must "follow the decision of the proper ecclesiastical body if such decision becomes important in determining property rights." *Presbytery of Bismarck v. Allen,* 74 N.D. 400, 22 N.W.2d 625, 631 (1946). And: "The ecclesiastical body in making its decisions can interpret its own laws and pass upon its own procedures without court interference." *Id.* Therefore, I

agree with the trial court when it ruled the courts "should not be trying to interpret church doctrine in a criminal case, such as this one involving church property, any more than it should in a civil case."

[¶ 53] The majority insists in paragraph 8 a "motion to dismiss is not a proper procedural vehicle to determine ... Burckhard's authority to expend church funds or whether he made unauthorized expenditures with the funds." In paragraph 36, the majority again insists, "Burckhard's authority over the church funds is a question of fact not appropriate for resolution under a N.D.R.Crim.P. 12(b) motion to dismiss." But a defense or objection that the complaint "fails to show jurisdiction in the court or to charge an offense ... must be noticed by the court at any time during the pendency of the proceeding." N.D.R.Crim.P. 12(b)(2). When a constitutional defense is raised that affects jurisdiction, like the Free Exercise of Religion one here, in my opinion a motion to dismiss properly calls for early decision.

[¶ 54] Early adjudication, and interlocutory appellate review, for many constitutional interests are necessary because the resulting decision, "though short of final judgment," "determine[s] claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that ... consideration be deferred until the whole case is adjudicated." *Behrens v. Pelletier*, 516 U.S. 299, 305, 116 S.Ct. 834, 838, 133 L.Ed.2d 773 (1996) (quoting *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949))(interest in avoiding trial; qualified immunity defense to claim for constitutional wrongs); *see also Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (interest in avoiding trial; Eleventh Amendment immunity); *Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979) (interest in avoiding trial; Speech or Debate Clause); *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (interest in avoiding trial; Double Jeopardy Clause); *Stack v. Boyle*, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951) (interest in avoiding imprisonment; Excessive Bail Clause). In my opinion, the free exercise of religion under the First Amendment and the constitutional separation of church and state are also important constitutional dimensions. The question of jurisdiction of secular courts over church funds and canon law are too important to be deferred until the entire case has been adjudicated.

[¶ 55] Therefore, I would affirm the trial court's prudent dismissal of this prosecution in the face of the evidence from the appropriate ecclesiastical officer who has not chosen to prosecute criminally for violation of church authority. Bishop Sullivan sufficiently explained:

By the authority vested in me as Bishop of the Fargo diocese, I appointed Father Burckhard to St. Catherine's parish at Valley City effective July 1, 1989. In accordance with the code of Canon Law, Father Burckhard was responsible for administration of all ecclesiastical goods belonging to St. Catherine's parish. As a physical person, he acted in the name of the parish, a juridic person. As a parish priest, however, Father Burckhard's administrative decisions concerning the ecclesiastical goods of the parish are always subject to oversight by the Diocesan Bishop.

As you are aware, troubling reports from St. Catherine's concerning the actions of Father Burckhard caused my office to investigate those allegations and initiate ecclesiastical procedures to redress any improprieties. Father Burckhard was removed from the parish on October 20, 1996. The church continues to pursue appropriate remedies within the ecclesiastical realm....

[¶ 56] Still, I would modify the dismissal to make it without prejudice to renewal of the prosecution if the Bishop or a higher church official yet may choose to join in prosecuting a criminal charge against this priest. If the church governance seeks to vindicate its property interests and enforce its canon laws in the civil courts, there is, of course, no reason why a criminal prosecution could not

proceed.[4] Then, of course, the church governance would need to provide the proof of lack of authorization for the priest's expenditures.

[¶ 57] Because the majority fails to honor the separation of church and state that the Free Exercise Clause of the First Amendment commands, absent a compelling state interest, I respectfully dissent from this reversal to reinstate jurisdiction of this criminal charge at this time. I would only modify to permit the criminal prosecution to proceed if the church governance chooses to do so.

[¶ 58] Otherwise, I would affirm the dismissal for lack of jurisdiction over church affairs.

[¶ 59] MARING, J., concurs.

---

4. *See* 16A Am.Jur.2d *Constitutional Law* § 423 (1998)(footnote citing *Serbian Eastern Orthodox Diocese* omitted):

In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals and adjudicating disputes over these matters; and when such choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.