2000 ND 166

STATE of North Dakota ex rel. Heidi HEITKAMP, Attorney General, Plaintiff and Appellee,

v.

FAMILY LIFE SERVICES, INC., dba Family Life Credit Services, and Gary Chaffin, Defendants and Appellants,

and

American Family Credit Services, et al., Defendants.

State of North Dakota ex rel. Heidi Heitkamp, Attorney General, Plaintiff and Appellee,

v.

Family Life Services, Inc., dba Family Life Credit Services, et al., Defendants,

and

Charlene Uchtman, Defendant and Appellant.

State of North Dakota ex rel. Heidi Heitkamp, Attorney General, Plaintiff and Appellee,

v.

Family Life Services, Inc., dba Family Life Credit Services, et al., Defendants,

and

Dennis Uchtman, Defendant and Appellant.

State of North Dakota ex rel. Heidi Heitkamp, Attorney General, Plaintiff and Appellee,

v.

Family Life Services, Inc., dba Family Life Credit Services, et al., Defendants

and

Patricia Larson, Defendant and Appellant.

State of North Dakota ex rel. Heidi Heitkamp, Attorney General, Plaintiff and Appellee,

v.

Family Life Services, Inc., dba Family Life Credit Services, et al., Defendants,

and

Darold Larson, Defendant and Appellant.

State of North Dakota ex rel. Heidi Heitkamp, Attorney General, Plaintiff and Appellee,

v.

Family Life Services, Inc., dba Family Life Credit Services, et al., Defendants,

and

Help and Caring Ministries, Benjamin Larson, Joseph Larson, and Diamond Card International, Inc., Defendants and Appellants.

State of North Dakota ex rel. Heidi Heitkamp, Attorney General, Plaintiff and Appellee,

v.

Family Life Services, Inc., dba Family Life Credit Services, and Help and Caring Ministries, Inc., et al., Defendants,

and

Lyn Sahr, Defendant and Appellant.

Nos. 990212, 990220, 990229, 990215, 990222, 990216, 990228.

Supreme Court of North Dakota.

Aug. 31, 2000.

As Amended Sept. 21, 2000.

David W. Huey (argued), Assistant Attorney General, Bismarck, Andrew Moraghan and Todd Adam Sattler, Assistant Attorneys General, Bismarck, for plaintiff and appellee.

Peter B. Crary, Fargo, Herbert W. Titus (argued), Troy A. Titus, P.C., Virginia Beach, VA, for defendants and appellants Family Life Services, and Gary Chaffin.

Karen Sue Prout (argued), Wahpeton, for defendant and appellant Charlene Uchtman.

Dennis Uchtman, Carthage, pro se.

Patricia Larson, Fargo, pro se.

Darold Larson, Fargo, pro se.

Lyn Sahr, Pine City, pro se.

Richard David Varriano, Moorhead, for defendants and appellants Help and Caring Ministries, Benjamin Larson, Joseph Larson, and Diamond Card International, Inc.

SANDSTROM, Justice.

[¶ 1] Family Life Services, Inc., doing business as Family Life Credit Services ("FLS"), Help and Caring Ministries, Inc. ("HCM"), and individual directors of those nonprofit corporations appealed from a district court judgment removing Darold Larson as a director from the HCM board for a period of five years, removing all current directors from the FLS board, and reconstituting the FLS board. We hold the district court's act of reconstituting the FLS board implicates the Establishment and Free Exercise Clauses of the First Amendment, and the court, under the circumstances, did not have authority to reconstitute the board. We reverse that part of the judgment reconstituting the FLS board, affirm all other parts of the judgment, and remand with directions for the court to dissolve FLS in accordance with the involuntary dissolution provisions under N.D.C.C. ch. 10–26 or, in the court's discretion, to impose alternative remedies of injunctive relief and civil penalties authorized under N.D.C.C. § 13–07–07. Because the trial judge, following appellate arguments, may have created an appearance of partiality, the Chief Justice shall appoint a new judge to preside on remand.

I

[¶ 2] Darold Larson founded, operates, and controls a number of North Dakota nonprofit corporations with both secular and religious objectives. In his appellate brief Larson describes the relevant organizations he founded:

I am the founder of Help and Caring Ministries Inc. ("HCM") and its associated agencies: Women's Care Clinic Inc., a Christian crisis pregnancy center for women; Perry Center Inc., a Christian maternity home for single mothers; Christian Family Life Services Inc. ("CFLS"), a Christian adoption agency; National Association of Christian Counselors Inc. ("NACC"), a Christian ministry providing counseling training to lay-counselors; Family Legal Clinic Inc., a Christian attorney referral ministry; National Association of Christian Credit Counselors ("NACCC"), a ministry providing biblical training in credit counseling and fellowship to its members; and Family Life Services Inc., DBA Family Life Credit Services ("FLS"), a Christian ministry providing credit counseling and debt pooling to clients in several states....

All the above ministries are part of the body of Help and Caring Ministries and are organized under its Constitution. .... Together they are one ministry in Christ Jesus working to help fulfill the commission of God.... Every HCM agency uses the same logo—a family standing on the Word of God.... They work together to minister the gospel under the headship of Christ as mediated through the leadership of HCM.

[¶ 3] In January 1996 the State, through the attorney general, brought an action against FLS, HCM, related nonprofit corporations, and individual directors of the boards of the corporations, claiming they violated several provisions of the Consumer Credit Counseling Services Act, N.D.C.C. ch. 13–07, and the Nonprofit Corporation Act, N.D.C.C. chs. 10–24 through 10–26. The attorney general sought involuntary dissolution of FLS and HCM under N.D.C.C. § 10–26–07, injunctive relief and civil penalties under N.D.C.C. § 13–07–07, and other appropriate relief as the court might provide. The district court found violations of law by Darold Larson, as the founder of these corporations, and by the corporations, acting through Larson and other board members. The court found there were numerous instances of commingling of client trust funds, improper loans to directors and officers, misappropriation of funds, and failure to keep adequate corporate financial records. As a remedy for the violations, the court ordered Darold Larson removed from the HCM board of directors and also ordered removal of all members of the FLS board of directors. The court reconstituted the FLS board, expanding it to seven members and specifying the manner for selecting the new members. The corporations and individual board members appealed from the court's judgment.

[¶ 4] The trial court had jurisdiction under N.D. Const. art. IV, § 8, and N.D.C.C. §§ 27–05–06, 10–26–07, 10–26–10, and 13–07–07. The appeals are timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. §§ 29–01–12 and 29–28–07.

II

[¶ 5] The State, through the attorney general's office, filed this action under N.D.C.C. § 13–07–07, seeking civil fines and injunctive relief prohibiting FLS from commingling client trust money. Under N.D.C.C. § 13–07–07, the attorney general is expressly granted authority to investigate "upon the attorney general's own motion" any alleged violation of law by a consumer credit counseling service. The statute also specifically authorizes the attorney general to "institute a civil action in the name of the state in the district court for an injunction prohibiting any practice in violation" of N.D.C.C. ch. 13–07. FLS

concedes the attorney general had authority to file an action seeking redress under N.D.C.C. ch. 13–07.

[¶ 6] The State also filed this action under N.D.C.C. § 10–26–07, seeking dissolution of FLS on the ground it exceeded and abused its authority.[1] Section 10–26–07 provides a "corporation may be dissolved involuntarily by a decree of the district court in an action filed by the attorney general...." Section 10–26–09, N.D.C.C., provides "[e]very action for the involuntary dissolution of a corporation shall be commenced by the attorney general.... Summons shall issue and be served as in other civil actions." Under those provisions, the attorney general is specifically authorized to bring an action in the courts for involuntary dissolution of a nonprofit business corporation. FLS asserts, however, the attorney general did not have authority to bring this action seeking dissolution of the corporation under N.D.C.C. ch. 10–26 without prior certification by the secretary of state that the corporation violated the law. FLS's argument rests upon the secretary of state's authority under N.D.C.C. § 10–26–08, which provides the secretary of state "shall certify, from time to time, the names of all corporations which have given causes for dissolution as provided in this chapter, together with the facts pertinent thereto.... Upon the receipt of such certification, the attorney general shall file an action in the name of the state against such corporation for its dissolution." FLS claims the attorney general cannot file an action for dissolution without first receiving certification from the secretary of state of corporate violations.

[¶ 7] The interpretation of a statute is a question of law fully reviewable on appeal. *Peterson v. Traill County*, 1999 ND 197, ¶ 10, 601 N.W.2d 268. Our primary objective in construing a statute is to ascertain the intent of the legislature by looking at the language of the statute itself and giving it its plain, ordinary, and commonly understood meaning. N.D.C.C. §§ 1–02–02; *Falcon v. State*, 1997 ND 200, ¶ 9, 570 N.W.2d 719. Statutes must be construed as a whole to determine the legislative intent, and the intent must be derived from the whole statute. N.D.C.C. §§ 1–02–07 and 1–02–38(2); *Narum v. Faxx Foods, Inc.*, 1999 ND 45, ¶ 18, 590 N.W.2d 454. Under N.D.C.C. §§ 10–26–07 and 10–26–09 the attorney general is given specific statutory authority to commence a civil action to dissolve a corporation for violations of the law. *See Perry Center, Inc. v. Heitkamp*, 1998 ND 78, ¶ 49, 576 N.W.2d 505. While N.D.C.C. § 10–26–08 mandates the attorney general to file a dissolution action upon receipt of certification of violations by the secretary of state, we do not construe that section as imposing any limitation upon the attorney general's authority, on her own motion, to bring an action to dissolve a corporation under N.D.C.C. § 10–26–09.

[¶ 8] The language of N.D.C.C. § 10–26–08 does not expressly require certification by the secretary of state as a prerequisite to the attorney general bringing an action to dissolve a nonprofit corporation under N.D.C.C. § 10–26–09. We construe provisions together, if possible, to give meaning to each of them. *See Trollwood Village Ltd. Partnership v. Cass County Bd. of County Comm'rs*, 557 N.W.2d 732, 737 (N.D.1996). We construe these provisions together as follows. If the secretary of state files a certification under N.D.C.C. § 10–26–08, the attorney general must file an action to dissolve the

---

1. In 1997 the legislature enacted the Nonprofit Corporation Act, N.D.C.C. ch. 10–33. The trial court concluded "FLS is a non-profit corporation, organized under and subject to the provisions of North Dakota law regarding corporations. Because this cause of action arose before N.D.C.C. ch. 10–33 was enacted and N.D.C.C. ch. 10–24 through ch. 10–28 were repealed, N.D.C.C. ch. 10–24 through ch. 10–28 govern the conduct of FLS in this action." Consequently, this case was tried under and is governed by N.D.C.C. chs. 10–24 through 10–28 and ch. 13–07.

corporation. In the absence of a certification by the secretary of state, the attorney general retains the discretionary authority to file a dissolution action as authorized under N.D.C.C. §§ 10–26–07 and 10–26–09.[2]

[¶ 9] This interpretation is consistent with the long recognized rule that the State, acting through the attorney general, has the right, independent of any statutory provision, to institute an action in the courts when it is required for the general welfare of the people. *State v. Hooker*, 87 N.W.2d 337, 340 (N.D.1957). In the absence of legislation clearly limiting the attorney general's discretion to bring an action to dissolve a corporation on the State's behalf under N.D.C.C. § 10–26–09, we will not lightly infer such a limitation. We hold certification of corporate wrongdoing by the secretary of state under N.D.C.C. § 10–26–08 is not a statutory prerequisite for the attorney general to bring a dissolution action under N.D.C.C. § 10–26–09. The attorney general, therefore, had authority to file this action under N.D.C.C. ch. 10–26 to seek dissolution of FLS for violation of those statutory provisions.

### III

[¶ 10] A brief summary of the formation and purpose of HCM and FLS is necessary for an understanding of the issues on appeal. Darold Larson incorporated HCM as a nonprofit charitable corporation in 1986 for the purpose of providing "a broad range of counseling and support services to the community from a Biblical perspective and to minister to individual and family human need whether spiritual, mental or physical."

[¶ 11] Darold Larson, Patricia Larson, and David Pence incorporated FLS as a nonprofit charitable corporation in 1989.

As set forth in the amended articles of incorporation and bylaws, the purpose of FLS is:

> [t]o provide a broad range of counseling and support services to the community from a Biblical perspective through credit counseling, budgeting and debt liquidation programs, including to minister to individuals and family human needs, whether spiritual, mental, or physical; to provide pro-life resources to women in an untimely or unplanned pregnancy who choose to carry their babies to term.

[¶ 12] Among the services performed by FLS for its clients is the function of debt adjusting. FLS counselors help clients deal with immediate financial crisis and assist clients in getting their lives under fiscal control. As part of this process, counselors may share the gospel of Jesus Christ.

[¶ 13] On a periodic basis, debtor clients send an agreed amount of money to the corporation's home office in North Dakota to be disbursed to creditors. When the debtors enter into a debt adjustment agreement, they pay a one-time set-up fee to FLS. They also pay an administrative fee of ten percent of the amount which is sent to the home office to be disbursed to creditors. FLS also receives compensation from some creditors on amounts remitted through FLS. Funds received from FLS clients located in North Dakota, Minnesota, Colorado, and Arizona are deposited into separate client trust accounts. Funds received from clients located in other states are deposited into a single client trust account designated the "ZZ account." In his appellate brief, Larson estimates about $350,000 to $400,000 per month of client money flowed into the ZZ account.

---

2. The Nonprofit Corporation Act, N.D.C.C. ch. 10–33, was adopted by the legislature in 1997. It specifically requires the attorney general to give 30 days notice to a corporation before filing an action and an additional 30 days to correct an act or omission by the corporation when the attorney general intends to seek dissolution of the corporation. N.D.C.C. § 10–33–107(1)(e). The Act was not in effect when this action was filed and does not, therefore, govern this case. There is no similar limiting language under N.D.C.C. ch. 10–26, the statute under which this action was filed and tried.

## A

[¶ 14] Most of the district court's relevant findings and conclusions are undisputed. The court found that as of December 1995, FLS was insolvent, with liabilities exceeding the value of its assets and its accounts payable behind by 90 to 120 days. The court found the insolvency was primarily a result of corporate mismanagement by Darold Larson and use of client trust accounts for impermissible purposes. The court found Larson unilaterally decided what personal expenses FLS would pay and he handled trust account transactions personally and withheld information from bookkeepers and employees of FLS. The court found Larson instructed an FLS accounting supervisor "to keep her mouth shut" about ZZ account transactions and that Larson had others "go through ZZ client trust account bank statements and pull out all of the debit memos that documented the withdrawals he had made from the ZZ account." The court found Larson personally made 30 withdrawals from the client trust account between July 1994 and November 1995 and "hid the trust account withdrawals from FLS directors and auditors." The court found, as a result of Larson's trust account transactions, client trust funds were commingled with other FLS funds and were used as a source of FLS operating capital. The court found it was not possible to determine precisely how much money was missing from client trust accounts when the lawsuit was filed, due to Larson's failure to maintain accurate records of his transactions.

[¶ 15] The court found FLS and HCM, acting primarily through Darold Larson, breached their fiduciary duty to clients to hold client funds in trust and to not commingle those funds with other funds or use those funds for purposes other than for which they were entrusted. The trial court concluded the commingling of funds violated the provisions of N.D.C.C. § 13–07–04 and also constituted an exceeding and abuse of authority in violation of N.D.C.C. § 10–26–07(2).[3]

[¶ 16] The trial court found loans made by Darold Larson with corporate funds to David Clemens and Benjamin Larson, who at the time were officers and directors of FLS, constituted a violation of the N.D.C.C. § 10–24–27[4] prohibition against a corporation making loans to its directors or officers. The court also found the improper loans constituted an abuse and exceeding of FLS's authority to operate as a nonprofit tax exempt organization, in violation of N.D.C.C. § 10–26–07(2).

[¶ 17] Darold Larson concedes wrongdoing in his role as founder and chief operator of FLS and HCM. Larson concedes the ZZ account was "an express trust dedicated to payment of the client's creditors" and "FLS had an obligation not to commingle client funds." He also concedes client funds deposited in the ZZ account were

---

**3.** Section 13–07–04, N.D.C.C., provides:

A consumer credit counseling service shall deposit in a trust account in a financial institution, within one business day of receipt, any payments received from or on behalf of a debtor. A debtor's payments must be identifiable in the trust account. Funds in the trust account may not be commingled with any other funds. The consumer credit counseling service shall credit any interest accrued as a result of payments deposited in a trust account to debt management education programs.

When the alleged violations occurred, N.D.C.C. § 10–26–07(2) provided:

A corporation may be dissolved involuntarily by a decree of the district court in an action filed by the attorney general when any of the following is established:

. . . .

2. The corporation has continued to exceed or abuse the authority conferred upon it by law.

**4.** When the alleged violations occurred, N.D.C.C. § 10–24–27 provided:

No loans shall be made by a corporation to its directors or officers. The directors of a corporation who vote for or assent to the making of a loan to a director or officer of the corporation, and any officer or officers participating in the making of such loan, shall be jointly and severally liable to the corporation for the amount of such loan until the repayment thereof.

frequently withdrawn and used for "loans" or "advances" to pay for operational expenses of FLS. He concedes this practice violated the prohibition against commingling of client trust funds under N.D.C.C. § 13–07–04. Larson claims, however, he was unaware this practice was in violation of the law when it was occurring and that prior to the filing of this lawsuit by the attorney general the practice of commingling client trust funds with administrative funds had ceased by self-corrective action in 1995.[5]

[¶ 18] Larson also concedes he violated the law by making improper loans of corporate funds. He acknowledges FLS made an improper corporate loan to Larson's son, Benjamin Larson, who at the time was an FLS board member. Larson also concedes FLS made an improper corporate loan to board member David Clemens for the purchase of a truck, but Larson characterizes the loan as an "investment" in Clemens so he could earn money for his family. Larson also concedes an improper loan by FLS was made to himself in the amount of $1,635.54, but Larson characterizes it as "an expense advance" to expand FLS, and he does not see it as a significant wrongdoing.

## B

[¶ 19] The commingling of client trust funds and the illegal loans to board members and officers of the corporation are the primary activities of wrongdoing upon which the trial court predicated the statutory violations and the necessity for remedial action. However, the court made additional findings of wrongdoing by FLS and Larson, some of which are disputed by Larson. On appeal, a trial court's findings of fact are presumed to be correct, and the complaining party bears the burden of demonstrating a finding is clearly erroneous. *Wagner v. Wagner*, 1998 ND 117, ¶ 9, 579 N.W.2d 207. If the parties do not

challenge specific findings of fact, we will not review them. *Id.* A trial court's findings of fact are not clearly erroneous under N.D.R.Civ.P. 52(a) if they have support in the evidence and we are not left with a definite and firm conviction a mistake has been made. *Griffeth v. Eid*, 1998 ND 38, ¶ 6, 573 N.W.2d 829.

[¶ 20] The trial court found Larson used FLS funds, without board approval, to purchase a red Dodge shadow convertible as a Christmas present for his wife in 1994 and the Larsons used the vehicle for personal travel. Larson asserts the purchase of the car "is a reasonable expenditure shielded from judicial second-guessing by the business judgment rule." He further asserts the car that he purchased with corporate moneys was four years old and cost only $7,000 and was therefore a reasonable and valid expense of the corporation. He provides no citations or authority to support his position.

[¶ 21] Larson misapprehends the focus of the trial court's findings on this issue. The court found not only that the automobile had been purchased by Larson but that the FLS board members had not approved the purchase at the time it was made. The court also found although the vehicle title was in the name of Christian Family Life Services, Inc., and FLS made the loan payments and paid the insurance premiums, the vehicle was not recorded as an asset on the general ledger records of the corporation. The trial court's findings on this issue are supported by the record evidence, and we conclude, therefore, the findings are not clearly erroneous.

[¶ 22] The trial court found an individual client trust account that was closed in September 1993 had a remaining balance of $7,326.07 and Larson "made no effort to determine the rightful owners of these client funds." The court concluded Larson's failure to disburse the client funds within 45 days after the account was closed

---

5. Neither Larson's ignorance of the law nor his cessation of the wrongdoing discredits the court's finding of statutory violations by this

conduct. *State v. Sundquist*, 542 N.W.2d 90, 91 (N.D.1996) (ignorance of the law is no excuse for noncompliance).

violated N.D.C.C. § 13–07–06. The court also concluded the action constituted an exceeding and abuse of authority in violation of N.D.C.C. § 10–26–07(2). Larson claims the balance in the closed account "represents checks which for one reason or another were sent out, but not cashed." He concedes FLS had a duty to reissue the checks but claims the failure to do so within 45 days was not in violation of the statute. The relevant language of N.D.C.C. § 13–07–06 provides:

> The consumer credit counseling service may withdraw and retain as partial payment of the service's total fee up to fifteen percent of any sum deposited by the debtor for distribution. The remainder must be disbursed to the listed creditors in accordance with the parties' agreement. Disbursement must be made within forty-five days after deposit by the debtor.

The trial court specifically found FLS, acting through Larson, "made no effort" to determine the rightful owner of the funds within 45 days after the client trust account was closed. The trial court's finding is supported by the record evidence, and the finding supports its conclusion FLS and Larson failed to comply with the statute.

[¶ 23] Relating to this same account, Larson also disputes the following specific findings by the court that Larson "stole" the funds:

> ... When client trust account # 6301118579 was closed in September 1993, Larson took possession of the remaining balance of $7,326.07 in client trust funds and made no effort to determine the rightful owners of these client funds.
> ... Instead he "loaned" $6,000 of these client trust funds to FLS. FLS, under Larson's direction and control repaid this amount to Larson personally over a period of less than a year. The loan and repayment to Larson was accounted for in FLS general ledger account # 2313, "Cash Loan", a liability account....

Larson stole $6,000.00 from the trust account for his own personal use. The money was later recovered.

Larson claims the court's findings on this issue are clearly erroneous. He explains the situation from his point of view:

> The court's description makes it appear that I had misappropriated these funds and that by some undefined process they were "later recovered." The record shows that I purchased a cashier's check for $5,000 on January 16, 1996 with FLS funds which I testified had been in the ministry safety deposit box. I gave the check to FLS bookkeeper Karen Pust for safekeeping. She mentioned it to BCI investigator Tim Erickson during a discussion at the outset of the receivership, and he took custody of the check from her.... Thus, the funds "recovered" were not found in my possession, but in custody of the accounting department of FLS.
>
> The remaining balance of the $7,326.07 was in the FLS safety deposit box when it was opened by Assistant Attorney General David Huey, also on January 16th.... I do not see how I can be said to have "stolen" FLS funds when those funds were in the possession of FLS.

[¶ 24] The difference in viewpoint between the court and Larson is whether Larson intended to misappropriate these funds to his own use or whether he intended to return the funds to the client originally submitting them or to the client's creditors in accordance with an agreed upon debt adjustment plan. The trial court inferred from Larson's handling of these moneys that Larson intended to keep the moneys for himself and that Larson's actions constituted a misappropriation of the funds. We are not left with a definite and firm conviction the trial court made a mistake in analyzing this evidence, and we, therefore, conclude the trial court's findings on this issue are not clearly erroneous.

[¶ 25] Darold Larson also disputes the trial court's findings about an alleged loan "to the ministry" of $100,000 by an unidentified person. Larson asserts the court's "implication" Larson misappropriated this money to his own use is clearly erroneous. The trial court specifically found:

> Between 1990 and 1991 Darold Larson claims that a man he does not know who he identifies by the name of "Mack" loaned him (HCM) $100,000.00.... There is no documentation other than documents signed and prepared by Larson that a loan existed. A large amount of cash flowed into FLS described as the Mack loan and was later drawn out prior to and in October 1995 just prior to Larson resigning as administrator of FLS. Larson claims these funds were returned to Mack in the form of cash. There exists no documentation that anyone other than Darold Larson received these funds. Darold Larson was unable to identify Mack at the time of trial. Darold Larson informed no one on the HCM Board or FLS Board of the Mack loan. This Court does find the story outlined ... unbelievable and the testimony given by Larson regarding this matter not trustworthy. There has been no credible evidence submitted to support the proposition that the $100,000 described was returned to anyone other than Larson.

Larson disputes this finding by the trial court and offers the following explanation in his appellate brief:

> [The court's finding] is about a loan to the ministry of $100,000 in cash, which was held in isolation in a safety deposit box and then returned intact to the donor.... The "MAC loans" recorded on the FLS books in June, 1995 represented, as the testimony shows, funds from the ZZ account. I characterized them as "MAC loans" because I considered the funds in the safety deposit box as security for these advances.... The trial court found my affidavit about the Mac funds "unbelievable." ... If the court is indicating its belief that the Mac money never existed, then certainly there was no one to return it to, including me. If the court's finding is that I received the money as a loan to the ministry, but then never returned it to Mac, there is no documentation of the existence or use of these funds to support such a finding. Thus, the court's implication that I may have personally appropriated the Mac money has no support at all in the record.

[¶ 26] According to Larson's affidavit, a local businessman contacted Larson and informed him he wanted to assist and encourage Larson's pro-life activities on the abortion issue but he wished to remain anonymous. According to Larson, during several meetings the businessman provided cash, in $100 bill denominations, totaling $100,000 as a no-interest loan to Larson and his organizations. According to Larson, this businessman was not interested in securing the terms of the loan with any writings or promissory notes. Larson claims he repaid all the money in cash to the man by October 1995. The trial court simply did not believe Larson's account of the events was believable or trustworthy. The trial court, as the factfinder in a bench trial, is the determiner of credibility issues and we do not second-guess the trial court on its credibility determinations. *See Zimmerman v. Minot Public School Dist. No. 1*, 1998 ND 14, ¶ 19, 574 N.W.2d 797. The trial court's findings on this issue entailed reasonable inferences drawn from the record evidence. We will not retry the credibility issue, and we are not left with a definite and firm conviction the trial court made a mistake. We, therefore, conclude the trial court's findings of fact on this issue are not clearly erroneous.

IV

A

[¶ 27] FLS concedes corporate wrongdoing and violations of the law un-

der N.D.C.C. chs. 13–07 and 10–26, but takes issue with the court's remedy of reconstituting the FLS board of directors. Instead of dissolving FLS or imposing injunctive restrictions and fines on the corporation, the court reconstituted the FLS board from five to seven members and specified the manner for its selection:

3. [T]he new FLS Board shall consist of seven members. This board shall be selected in the following manner:

  a. The branch office managers that have been active for the past 12 months with FLS shall select three members to the board subject to the following restrictions.

    1. The three board members elected must each be elected by an absolute majority (over 50%) of the branch office managers.

    2. No more than two of the elected officers shall be a financially interested person as defined by N.D.C.C. § 10–33–27(3).

  b. The employees of FLS shall elect one member to the board of directors by an absolute majority of the employees. The elected board member shall not be an employee of FLS.

  c. F–M Evangelical Ministerial Association Board of Directors [Ministerial Association] shall appoint three members to the board of directors of FLS. None of the three appointed may have a financial interest in FLS as defined by N.D.C.C. § 10–33–27(3).

The court revealed it wanted to replace the current leadership of FLS with persons of similar religious beliefs and goals.

[¶ 28] FLS claims there is no statutory authority for the court to dismantle and reconstitute the FLS board of directors. FLS asserts the court "studiously ignored the well-crafted comprehensive statutory scheme of equitable remedies contained in N.D.C.C. chs. 10–24 through 10–28 and ch. 13–07 in a tendentious effort to take over FLS and to restructure it according to criteria found in no statute or court rule. N.D.C.C. Section 10–26–07 provided for the remedy of involuntary dissolution only...."

[¶ 29] FLS also asserts the court's remedy of reconstituting the FLS board violated the First Amendment prohibition against government establishment of religion and violated FLS's religious free exercise rights. At oral argument, the attorney for FLS argued the trial court, by dismantling and reconstituting the board, "turned a secular dispute into an unconstitutional religious remedy." Counsel opined if the court had instead dissolved the corporation "then it could not have become a religious dispute because dissolution would not have gotten the court involved in the religious aspects" of finding "compatible religious organizations to replace the board." Counsel argued dissolution would not involve a religious dispute, because the court would not have to involve itself with doctrinal issues. He also argued that, whereas dissolution may normally be considered a more drastic remedy, under the circumstances of this case the court's remedy of reconstituting the board is a more drastic and more harsh remedy than dissolution.

[¶ 30] The district court has express authority to involuntarily dissolve a nonprofit corporation that has continued to exceed or abuse the authority conferred upon it by law. N.D.C.C. § 10–26–07(2). Commensurate with that authority, the district court has the "full power to liquidate the assets and affairs of a corporation." N.D.C.C. § 10–26–10. Upon liquidating the assets and affairs of the corporation, the court is authorized to enter a decree of dissolution "whereupon the existence of the corporation shall cease." N.D.C.C. § 10–26–15.

[¶ 31] The involuntary dissolution of a corporation by the courts is an "extreme remedy." *Balvik v. Sylvester,* 411 N.W.2d 383, 389 (N.D.1987). In *Balvik,* a former vice president of a close corpora-

tion brought an action against the majority shareholder and the corporation board of directors, seeking the corporation's dissolution by the court or, alternatively, the payment of the true value of his stock. The district court ordered dissolution of the corporation. On appeal, this Court held the district court abused its discretion in dissolving the corporation, explaining:

> We have recognized that forced dissolution of a corporation is a drastic remedy which should be invoked with extreme caution and only when justice requires it. In a sense, a forced dissolution allows minority shareholders to exercise retaliatory "oppression" against the majority. Although § 10–21–16, N.D.C.C., mentions only dissolution as a remedy for oppressive conduct, we agree with those courts which have interpreted their similar statutory counterparts to allow alternative equitable remedies not specifically stated in the statute.

*Balvik*, 411 N.W.2d at 388.

[¶ 32] FLS effectively argues the opposite side of the *Balvik* case. FLS claims the trial court had no authority to impose a remedy of reconstituting the board of directors for FLS rather than dissolving the corporation. It argues involuntary dissolution would be a less harsh remedy in this case because, unlike reconstituting the board of directors, dissolution of the corporation would not implicate First Amendment rights. To resolve this issue we must consider the First Amendment implications of the court's remedy.

### B

[¶ 33] Early in these proceedings, during May 1996, an assistant attorney general articulated the State's view that the F–M Evangelical Ministerial Association was a recognized and credible organization of evangelical ministers who hold religious and ideological beliefs consistent with the defendants' beliefs. The assistant attorney general suggested three of the ministers from the evangelical congregations

should step forward to serve on the FLS board of directors. During later proceedings, the court, while discussing potential remedies for the violations it had found, said it was going to institute a seven-member board of directors to govern FLS and the court was looking for alternatives to select members to the first reconstituted board. The court said, "[Y]ou had mentioned the Evangelical Ministerial Group. That might be a group or interest group, I think, that would be a very much pro-life Christian group that may have an interest in going on the board." Later in the proceedings, the following colloquy occurred between the court and an intervenor party:

> MR. WISHNATSKY: So, Your Honor, in effect, you're saying that certain branch offices who never appeared in this case, and are just people that have—will be the religious leadership of the ministry?

> THE COURT: No. They will be the head of the—they will determine who will be the majority of this corporation.

> MR. WISHNATSKY: Which will set its religious doctrine and policy. And you've never even heard a word from them.

> . . . .

> THE COURT: Well, I have heard that they were Christian.

[¶ 34] FLS argues the court, by reconstituting the FLS board and by choosing those who would select the new board members based upon their theological beliefs, became excessively entangled in the religious objectives and doctrine of FLS and also interfered with this nonprofit organization's free exercise of religion. While we have not found, nor have the parties directed us toward, any direct case authority construing these First Amendment issues in this context, some of the United States Supreme Court rulings in other contexts provide instructive guidance for this case.

[¶ 35] In *State v. Burckhard,* 1998 ND 121, ¶ 10, 579 N.W.2d 194, this Court summarized the federal and state constitutional protections based upon the principles of separation between church and state:

The First Amendment to the United States Constitution provides, in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." The First Amendment was made applicable to the states through the Fourteenth Amendment in *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); and *Everson v. Board of Educ.,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). The Establishment Clause was intended to erect "a wall of separation between church and State." *Reynolds v. United States,* 98 U.S. (8 Otto) 145, 164, 25 L.Ed. 244 (1878). Similarly, N.D. Const. Art. I, § 3, provides, in part: "[t]he free exercise and enjoyment of religious profession and worship, without discrimination or preference shall be forever guaranteed in this state. . . ." This provision affords protections similar to those provided by the Establishment Clause. *Bendewald v. Ley,* 39 N.D. 272, 168 N.W. 693, 696 (1917) (the First Amendment and this provision of the North Dakota Constitution are "to the same effect").

[¶ 36] In the seminal case regarding the separation of church and state, *Watson v. Jones,* 80 U.S. (13 Wall. ) 679, 727, 20 L.Ed. 666 (1871), the United States Supreme Court declared that although civil courts have jurisdiction to resolve church property disputes, the courts must, under separation of church and state principles, decide those disputes by paying homage to the pronouncements and decisions of the highest church authority or tribunal. In *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 120–21, 73 S.Ct. 143, 97 L.Ed. 120 (1952), the United States Supreme Court elevated the Watson rule of civil court deference to ecclesiastical decisions made by the church from one based upon general principles of separation of church and state to one based upon a First Amendment right to free exercise of religion against state interference. Referring to the *Watson* decision, the United States Supreme Court in *Kedroff,* explained its underpinnings:

The opinion radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

*Kedroff,* 344 U.S. at 116, 73 S.Ct. 143. State interference with the free exercise of religion is no less forbidden in the form of judicial action than in the form of state action through legislation. *Kreshik v. St. Nicholas Cathedral,* 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960). It is imperative the courts do not interject their own sense of "religiosity" into ruling from the bench. *See United States v. Bakker,* 925 F.2d 728, 740 (4th Cir.1991). The protections under the First Amendment extend to the religious activities of non-profit religious organizations, such as FLS, conducting commercial enterprise. *See Tony and Susan Alamo Found. v. Secretary of Labor,* 471 U.S. 290, 303, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985). The Free Exercise Clause of the First Amendment proscribes the government from lending its power to one or the other side in controversies over religious authority or dogma. *See Employment Div., Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The Free Exercise Clause affords protection to observe and practice one's religious beliefs unburdened by state law or regulation unless there is a compelling state interest to justify the burden. *State ex rel. Heitkamp v. Family Life Services, Inc.,* 1997 ND 37, ¶ 30, 560 N.W.2d 526.

[¶ 37] In *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2125, 29 L.Ed.2d

745 (1971), the United States Supreme Court outlined a three-prong test for determining whether a policy or statute violates the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . .; finally, the statute must not foster 'an excessive government entanglement with religion.'" [6] FLS does not argue the trial court's selection of a reconstituted board is without a secular purpose. The court's primary objective was to allow the corporation to continue as an operating business while ensuring it would obey the corporate laws and neither commingle client trust funds nor misappropriate corporate money to improper purposes. Also, FLS cannot reasonably argue the primary effect of the court's action is to advance or inhibit religion. The court quite clearly did not choose persons to select the reconstituted board with any objective of advancing or inhibiting FLS's stated religious purposes. Rather, FLS's Establishment Clause objection is that the trial court, by using religious criteria to choose the board selection groups, involved itself in an excessive entanglement with the religious doctrine and practice of FLS.

[¶ 38] In *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), a Massachusetts statute authorized churches and schools to veto the issuance of liquor licenses for premises within a five hundred foot radius of the church or school. In a suit brought by a restaurant operator, the United States Supreme Court concluded the statute, on its face, violated the basic principles of the Establishment Clause of the First Amendment. The court concluded "the statute, by delegating a governmental power to religious institutions, inescapably implicates the Establishment Clause." *Larkin*, 459 U.S. at

123, 103 S.Ct. 505. The court further explained that the delegation of governmental authority to regulate businesses, without imposing standards upon the religious organization for exercising the delegated authority, could result in the authority being used for religious purpose and with no guarantee that the authority would be used "exclusively for secular, neutral, and nonideological purposes." *Larkin*, 459 U.S. at 125, 103 S.Ct. 505.

[¶ 39] In this case, the court gave the FLS employees, the FLS branch managers, and the Ministerial Association unbridled authority to select a new board of directors to govern FLS. This group was given complete discretion to select the FLS trustees and could do so for their own purposes, religious or otherwise. The selected board may or may not collectively hold the same religious beliefs and ideology adhered to and practiced by the founders of FLS. The trial court's attempt to select entities that would follow the same religious beliefs and ideology of the founders necessarily involved the court in deciding FLS's religious doctrine and polity and placed the court in an excessive entanglement with religion in conflict with the principles underlying both the Establishment Clause and Free Exercise Clause of the First Amendment.

[¶ 40] Guidance is also provided by the United State Supreme Court in *Board of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 705, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994), concluding a New York statute that carved out a school district around village boundary lines intentionally drawn to include only practitioners of a strict form of Judaism violated the Establishment Clause. The United States Supreme Court reasoned a state cannot delegate its civic authority to a group chosen according to religious criteri-

**6.** In the context of government assistance to parochial schools, the United States Supreme Court has recently recast the excessive entanglement inquiry as "simply one criterion relevant to determining a statute's effect."

*Mitchell v. Helms*, 530 U.S. ——, ——, 120 S.Ct. 2530, 2532, 147 L.Ed.2d 660, 665 (2000); *see also, Agostini v. Felton*, 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

on nor may it deliberately delegate discretionary power to an individual, institution, or community on the ground of religious identity. *Grumet*, 512 U.S. at 698–699, 114 S.Ct. 2481. Although the factual circumstances in *Grumet* differ from those in this case, the constitutional infirmity of the state action is the same. In reconstituting the FLS board and selecting those who would choose its governing body, the trial court delegated both civic authority and discretionary power on the basis of religious criterion and identity. In doing so, the court, perhaps quite unintentionally, was acting contrary to the principles of the Establishment Clause and the Free Exercise Clause of the First Amendment.

▆▆▆ [¶ 41] As the United States Supreme Court explained in *Everson v. Bd. of Educ.*, 330 U.S. 1, 11, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the underpinning of the First Amendment guarantees against government establishment of religion and government interference with the free exercise of religion is the conviction that "individual religious liberty could be achieved best under a *government* which was *stripped of all power* to tax, to support, or otherwise to assist any or all religions, or *to interfere with the beliefs of any religious individual or group.*" (Emphasis added.) The trial court clearly recognized FLS operated with religious objectives and motivation as well as with secular purpose. Perpetuation of a religious organization's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large. *Kedroff v. St. Nicholas Cathedral*, 344 U.S. at 116, 73 S.Ct. 143. By using religious criterion to choose those who would select the FLS governing body, the court could not offer any guarantee the religious underpinnings of FLS would remain intact or the theological and ideological objectives of the founders would continue to drive FLS as an organization.

C

▆▆▆ [¶ 42] The United States Supreme Court abides by a cardinal principle that if a serious doubt of a statute's constitutionality is raised, the court will first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided. *International Ass'n of Machinists v. Street*, 367 U.S. 740, 749–50, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). *See also Rayburn v. General Conference of Seventh–Day Adventists*, 772 F.2d 1164, 1166 (4th Cir.1985). This Court also construes statutes to avoid constitutional conflicts, if possible. *Ash v. Traynor*, 1998 ND 112, ¶ 7, 579 N.W.2d 180. If a statute may be construed in two ways, one that renders it of doubtful constitutionality and one that does not, we adopt the construction that avoids constitutional conflict. *Id.*

[¶ 43] The express remedy provided under N.D.C.C. § 10–26–07 for corporate violations of the law is involuntary dissolution of the corporation. We recognized in *Balvik*, 411 N.W.2d at 388, a statute which specifically authorizes dissolution of a corporation impliedly includes within it alternative equitable remedies that are less harsh. Nevertheless, where, as here, the alternative remedy will violate the principles of free exercise of religion and prohibition against government establishment of religion under the First Amendment, we will not interpret the statute as authorizing the alternative remedy. Under the circumstances of this case, we conclude the district court could not reconstitute the board of directors for FLS. The court's remedy resulted in excessive entanglement of the court in the religious doctrine and polity of FLS, as a nonprofit organization with religious purpose. In so doing, the court encroached upon the First Amendment protections from government interference in religious practice. The trial court's remedy created a serious potential infringement upon the free exercise of FLS's religious objectives and practices in conducting credit counseling from a Bibli-

cal perspective. In this situation, reconstituting the board was neither a less harsh nor a proper alternative to dissolution. We conclude it was not, therefore, an appropriate remedy for FLS's corporate violations under N.D.C.C. ch. 10–26.

## D

[¶ 44] The appropriate remedy here is not obvious. FLS has very clearly asserted on appeal the remedy of dissolution provided under N.D.C.C. § 10–26–07 is less harsh than the remedy of reconstituting the FLS board. FLS also concedes there would be no constitutional infringement and it has no First Amendment constitutional claim if the court should choose to dissolve the corporation, because dissolution would not involve the court with religious doctrine or polity. FLS also asserts, however, the trial court should have considered imposing injunctive relief and civil fines, which are remedies specifically authorized under N.D.C.C. § 13–07–07, and are less harsh than dissolution of the entire corporation. The trial court may have decided, but did not expressly find or conclude, the alternative remedies of injunction and civil fines would be inadequate to rectify the violations committed in this case. Relevant to this issue of appropriate remedy, the trial court made the following specific findings and conclusions:

> .... Prior to the appointment of a receiver, FLS was nominally governed by a three-member board of directors. In actual practice, Darold Larson controlled the corporate and financial affairs of FLS. FLS has never had an independent board member not under the control of Darold Larson.
>
> ....
>
> ... As chief executive of FLS, [Larson] controls all aspects of the corporation's activities and has the final say on all matters of corporate policy. He does not answer to the FLS board of directors. He answers only to himself. The board of directors acquiesced and failed to exercise any authority over Darold Larson.
>
> ....
>
> ... While the nonprofit organizations Larson founded are nominally separate corporations, Larson's practice of dominating and controlling them, together with his practice of freely and unilaterally intermixing their financial affairs make any legal and accounting distinctions between the corporations meaningless.

[¶ 45] From these specific findings and conclusions one might infer the trial court did not believe alternative remedies to reconstituting the board of directors would suffice to either penalize the conduct or to stop future violations. The court obviously did not, however, conclude the violations were so onerous or the corporation's activity was so devoid of proper purpose or potential to provide worthwhile services in the future that dissolution was the answer. Had the court realized reconstitution of the FLS board was not an appropriate remedy, it is impossible to guess on this record whether the trial court would have chosen dissolution or the alternative remedies under N.D.C.C. ch. 13–07. Under these circumstances, we conclude the most appropriate course is to remand this case to the district court with instructions the court either dissolve FLS under N.D.C.C. § 10–26–07 or, in the alternative, impose alternative remedies provided under N.D.C.C. § 13–07–07.

## V

[¶ 46] Individual board members of FLS have appealed, claiming their removal from the board of directors violated their individual rights to due process. In view of our reversal of the court's remedy and remand for dissolution of FLS or, alternatively, for imposition of the remedies provided under N.D.C.C. § 13–07–07, these issues are not ripe for resolution. Section 10–26–10, N.D.C.C., expressly provides, in actions to dissolve or liquidate a corporation, "[i]t shall not be necessary to make

directors or members parties to any such action or proceedings unless relief is sought against them personally."

## VI

■ [¶ 47] Darold Larson requests "the portion of the judgment excluding me from the [HCM] board for five years be stricken," arguing the court was without authority to temporarily remove him from the HCM board.

[¶ 48] In a similar case, the Wisconsin Court of Appeals upheld a judgment permanently enjoining the founder of a non-profit corporation from serving as a director and trustee of the corporation, which was organized to provide financial support for religious, charitable, and educational causes. *John v. John*, 153 Wis.2d 343, 450 N.W.2d 795, 798 (Ct.App.1989). The removed director was found to have "engaged in a pervasive pattern of abuse of office including ... breach of fiduciary duties, deception and disobedience of the board of directors, waste, and mismanagement." *Id.* The Wisconsin appellate court rejected the founder's argument his removal violated his constitutional right to free exercise of religion:

> ... [W]e reject this argument because the judgment only brought to conclusion John's relationship with [the corporation].
>
> ... His fall from grace as an officer, director, and trustee of [the corporation] does not affect his ability to practice Roman Catholicism. He can be as faithful to the church with or without these offices. John points to no cardinal principle of Roman Catholicism that is affected by the judgment. The orders of the trial court are neither an affront to John's beliefs nor an assault upon his practice of those beliefs.

[¶ 49] *Id.* at 801. While Larson has not made the same free exercise argument, this case clearly supports the remedy of removal of a board trustee who has committed a pattern of abuses.

[¶ 50] Darold Larson was a named party to these proceedings, and he concedes he violated the law by commingling client funds with other moneys and by making illegal loans of corporate funds to a corporation director. The court has express statutory authority to dissolve HCM for violations of the law committed by the corporation, and HCM violated the law in this case through Larson's actions. Under our rationale in *Balvik*, 411 N.W.2d at 388, we conclude the court possessed inherent authority, under these circumstances, to impose an alternative equitable remedy of removing Darold Larson from the board for a specified period of time.[7]

## VII

■ [¶ 51] The oral arguments for this appeal on May 18, 2000, were webcast via the Internet. The trial judge presiding over this case, the Honorable Donovan Foughty, listened to the webcast and thereafter sent this Court seven pages of the transcript, explaining by cover letter, "[b]ased on the questions posed it may assist the Justices in understanding what the trial court did by reviewing [these pages] of the transcript." HCM filed a motion requesting this Court to disqualify the judge from any further participation in the case based on the loss of the judge's impartiality and the expression of prejudice manifested in the judge's submission. On May 21, 2000, this Court entered an order denying the motion and explaining "as there is no authority for the trial court's submission, it is rejected and will not be considered by this Court."

[¶ 52] In view of our remand for the trial court to impose an appropriate remedy, we must revisit this issue.

Cannon 2A, N.D.Code Jud. Conduct, provides:

---

7. Although not in effect when this action began and, therefore, not controlling here, we note N.D.C.C § 10–33–37 specifically authorizes the court to temporarily remove a director for violations of the law.

[¶ 53] Cannon 3E(1) requires a judge to disqualify himself or herself in a proceeding "in which the judge's impartiality might reasonably be questioned." The appearance-of-partiality test is one of reasonableness, and judges should err on the side of caution by disqualifying themselves in cases raising close questions. *See Farm Credit Bank of St. Paul v. Brakke*, 512 N.W.2d 718, 721 (N.D.1994).

[¶ 54] As this Court stated in its order of May 31, 2000, there is no basis or authority for the trial court's submission to this Court following oral arguments. The jurisdiction of the Supreme Court attaches upon the filing of the appeal, and generally the trial court has no further jurisdiction in the matter. *J.S.S. v. P.M.Z.*, 429 N.W.2d 425, 429 (N.D.1988).

[¶ 55] The transcript in these proceedings was over 7,000 pages. We assume the judge was well-intentioned and meant only to assist this Court in discovering the facts relevant to deciding the appeal. Nevertheless, intentional or otherwise, when the court submitted transmittal to this Court relating to issues in the case, it called into question the appearance of impropriety. Avoiding the appearance of judicial impropriety is of upmost importance to the integrity of the judicial system. *See Matter of Estate of Risovi*, 429 N.W.2d 404, 407 (N.D.1988). We therefore disqualify Judge Foughty from further presiding over this case on remand. The Chief Justice shall appoint another judge to preside. In determining an appropriate remedy, the new judge shall have full discretion to make its determination upon the record, and the findings and conclusions of the court in prior proceedings, or to hold additional evidentiary proceedings and request additional briefing on any and all matters relevant to the remedy determination.

## VIII

[¶ 56] We hold the trial court impermissibly reconstituted the FLS board, under the circumstances of this case. We therefore reverse that part of the judgment reconstituting the FLS board, affirm all other parts, and remand for redetermination of the proper remedy.

[¶ 57] GERALD W. VANDE WALLE, C.J., and WILLIAM A. NEUMANN, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.