LEVINE, J.
Appellant, Francis Benedict Guinan, appeals his conviction for grand theft of property, valued between $20,000 and $100,000. We find that the trial court was correct to find that there was sufficient evidence to sustain the conviction of grand theft. We also find, based on the specific facts of this case, that appellant’s prosecution did not constitute an “excessive entanglement with religion” in violation of the United States Constitution and the Florida Constitution.
Appellant was charged with grand theft of over $100,000 in property from St. Vincent Ferrer Catholic Church, resulting from his use of parish funds for his own personal benefit rather than for the benefit of the parish. Appellant took over leadership of the parish from the prior pastor, Father John Skehan, in 2003. Skehan remained involved in counting the monies given to the parish in the weekly offering, even after appellant became pastor. Renee Wardrip, the bookkeeper at the parish for the first year of appellant’s tenure, testified to paying a former church employee, who ceased work at the church in 2000, $675 a week for “not being there.” Wardrip also testified to paying appellant’s credit card bills for out-of-town travel. The next bookkeeper, Apple Woo, testified that appellant requested to see the cash collected in the offerings. Appellant would keep some cash and return to Woo a reduced sum to be deposited into the parish’s operating accounts. Colleen Head, another parish employee, also testified that appellant would keep cash from the weekly offertory and would instruct her to deposit only a part of the weekly offering. Head testified that appellant retained $4,600 in cash from just one week’s offerings.
Father Charles Notabartolo, the Vicar General of the Diocese of Palm Beach, testified that priests draw both a salary and an allowance for an automobile. The funds to pay priests’ salaries and automobile allowances are derived from the general fund raised at each parish. Although the diocese has no particular control over the parish accounts, Notabartolo stated that a priest’s personal expenses would not be paid out of the parish’s operating account since the priest receives a salary package. The priest is allowed to make distributions from the parish accounts, without permission of the bishop, as long as the distribution does not exceed $50,000 and the distribution is “for the good of the parish.” Even in the exercise of the individual parish’s discretion, the pastors were instructed to keep records of distributions, and these accounts devoted to charitable works were required to be reported to the diocese quarterly. The Chief Financial Officer for the diocese, Dennis Hamel, testified that the diocese promulgated explicit written procedures regarding how offertory funds were to be counted and deposited. The diocese, according to Hamel, monitored the finances of each parish to ensure that each pastor was properly administering his duties. Hamel conceded that certain parishes would hold funds in unreported accounts to keep reported account balances low to avoid incurring larger fundraising goals during the diocese’s annual fundraising appeal.
At trial, there was testimony regarding renovations to appellant’s parish-owned home, as well as frequent trips out of state to places such as Las Vegas, Ireland, and the Bahamas. When appellant took over at the parish, Hamel attempted to audit the parish. At that time, Hamel reviewed some documents, but appellant prevented *592 Hamel from returning to continue the audit or from observing the counting of the offertory. Appellant protested the audit and characterized it as a “witch hunt.” There was testimony that appellant removed cash from the offertory, and to avoid detection, Wardrip would create fake deposit slips to send to the diocese to hide the fact that cash was given directly to appellant. Appellant was present when the cash of the offertory was counted. After Wardrip resigned, Woo testified to an incident when she gave appellant a shoebox with about $11,000 in cash, and appellant returned the box with only $2,000 in cash remaining. Appellant told Woo he was planning to deposit the cash in other bank accounts. After Woo attended a bookkeepers’ training class sponsored by the diocese, Woo informed appellant that she could no longer participate in counting the offertory. Appellant stated to Woo, “[T]his is crap,” prompting Woo to resign the very same day.
Finally, several months after the first attempted audit, appellant agreed to an outside audit directed by Hamel. The outside auditor found that expenses listed as reimbursements for credit card payments were, by and large, “not church-related expenses.” The auditor found checks written directly to appellant for $30,640 without any accompanying receipts or documentation to justify payment to appellant. Appellant also wrote checks to Carol Ha-gen, the bookkeeper from appellant’s previous parish, St. Patrick’s Church. Nota-bartolo questioned appellant about these payments and told appellant that Hagen was not entitled to payments from St. Vincent Ferrer’s accounts. Despite this admonition, appellant wrote checks totaling $43,000 to Hagen. Appellant also wrote checks to Cardinal Newman High School for Hagen’s son’s tuition.
A forensic examiner testified for the state that during appellant’s tenure as pastor, there was a “cash shortfall” of roughly $372,343, and almost $487,000 in parish funds were misappropriated by appellant. The defense presented evidence from their own forensic examiner, claiming appellant deposited $134,000 in cash in other church accounts. Appellant also presented the testimony of another priest, who explained that parishes keep “slush funds” in separate accounts either to help needy parishioners or to reduce the amount of money they would be expected to remit to the diocese as part of the annual fundraising appeal. The defense presented other witnesses who stated that parish priests have substantial discretion in spending church funds. Nicholas King, a former vicar general, testified that a parish priest would have the discretion to pay for a past employee’s child to attend a Catholic high school and to pay for vacations for the pastor out of the parish’s operating account. The defense also presented the testimony of a former parishioner who decided to make a $100,000 gift to appellant out of appreciation for appellant’s past services. The parishioner wrote checks both to appellant and the parish to avoid appellant’s liability for federal gift taxes, but the parishioner intended that the checks written to the parish were for appellant’s use “as he so chose.”
Appellant offered justifications for the expenditures. He testified that he was granted permission to renovate the parish guesthouse utilizing parish funds. Appellant also explained that he paid Hagen out of St. Vincent Ferrer’s accounts in order to prevent Hagen from suing the diocese. Appellant likewise stated that he paid many church employees in cash. Appellant testified that he believed he had unfettered discretion to spend parish funds. Appellant conceded that the questionable bookkeeping practices he inherited from *593 Skehan continued while he was the parish priest, such as falsifying deposit records and having unreported accounts.
The trial court twice denied appellant’s motion for a judgment of acquittal and submitted the case to the jury. The jury convicted appellant of the lesser included offense of grand theft of property valued between $20,000 and $100,000. The appeal of this conviction ensues.
We review the denial of the motion for judgment of acquittal with the de novo standard. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). Appellant argues that the state’s evidence is insufficient as a matter of law. Essentially, appellant claims that the discretion accorded to appellant as a parish priest forecloses any inference that he took the property of another.
In this case, the state relies on circumstantial evidence to prove appellant’s intent. “[D]irect evidence of intent is rare and must be proven through the surrounding circumstances.” Galavis v. State, 28 So.3d 176, 178 (Fla. 4th DCA 2010). Where the state relies on circumstantial evidence to prove intent, the evidence “must be inconsistent with innocence.” Ramsammy v. State, 43 So.3d 100, 104 (Fla. 4th DCA 2010) (citation omitted). However, the state need not “conclusively rebut every possible variation of events which can be inferred.” Atwater v. State, 626 So.2d 1325, 1328 (Fla. 1993). Significantly, “the absence of direct proof on the question of the defendant’s mental intent should rarely, if ever, result in a judgment of acquittal.” Ehrlich v. State, 742 So.2d 447, 450-51 (Fla. 4th DCA 1999).
In this case, the state presented evidence from officials of the diocese that a parish priest is supposed to use parish money only for parish purposes. Both Hamel and Notabartolo testified that appellant’s expenditures for Hagen and for vacations would not be valid parish purposes. Further, the forensic examiner testified that thousands of dollars in cash from the offertory were unaccounted for and that a significant amount of parish money was spent on items that both Nota-bartolo and Hamel testified were not parish related. Significantly, Notabartolo and Hamel testified that money collected from the offertory is collected from the parish members for parish purposes. There was also testimony from staff at the parish that fake deposit slips were used to cover up the fact that cash was taken from the offertory.
The state has introduced evidence inconsistent with appellant’s claim of innocence. The case rises and falls on the intent of appellant when he used parish money and removed cash from the weekly offertory and whether it was for his personal benefit, not related to parish purposes. Ultimately, intent is a question of fact to be decided by the jury. J.G. v. State, 915 So.2d 274, 276 (Fla. 4th DCA 2005). We find that there was sufficient competent evidence of grand theft for the jury to find appellant guilty.
Appellant also challenges the subject matter jurisdiction of the trial court, alleging that the prosecution of this case would entail “excessive entanglement with religion” in violation of Amendment I of the United States Constitution and article I, section 3, of the Florida Constitution. “[T]he First Amendment prevents courts from resolving internal church disputes that would require adjudication of questions of religious doctrine” under the “religious autonomy” principle. Malicki v. Doe, 814 So.2d 347, 356, 356 n. 6 (Fla. 2002). Purely secular disputes involving religious institutions and third parties, however, do not create excessive entanglement of church and state when they in *594 volve “neutral principles of law.” Id. at 357 (quoting Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem’l Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969)).
Appellant relies on State v. Burckhard, 579 N.W.2d 194 (N.D.1998), and State v. Burckhard, 592 N.W.2d 523 (N.D.1999), for the proposition that a prosecution of a priest for spending parish money created an excessive entanglement of the government in the determination of canon law. The North Dakota Supreme Court was persuaded by a letter from the presiding bishop expressing a desire to pursue ecclesiastical remedies against the priest. On remand, the presiding bishop affirmed that he did not consider the priest’s transgressions a matter for criminal prosecution. Significantly, in the present case, unlike Burckhard, there was no letter from the presiding bishop or any other diocesan official stating that appellant’s transgressions were an ecclesiastical matter, not a criminal infraction. In fact, two representatives of the bishop, Notabartolo and Ha-mel, testified that appellant’s expenditures and procedures regarding the offertory were improper and against diocesan procedures. The trial court was not asked to resolve an internal church dispute and simply applied neutral principles of criminal law to convict appellant of grand theft.
We find the other issues raised by appellant to be without merit, and we affirm the conviction and sentence.

Affirmed.

WARNER and CONNER, JJ., concur.